FILED

2020 Nov-16  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**SANDRA LEE,**
**GUN OWNERS OF AMERICA, INC., and**
**GUN OWNERS FOUNDATION**

> **Plaintiffs,**

**Case No. 5:20-cv-632-LCB**

**vs.**

**UNITED STATES JUSTICE**
**DEPARTMENT,** *et al.*

> **Defendants.**

_____

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Now come Plaintiffs, by and through undersigned counsel, and for their Memorandum in Support of Plaintiffs' Motion for Summary Judgment state as follows:

# **TABLE OF CONTENTS**

STATEMENT OF LEGAL AUTHORITIES ............................................................4

INDEX OF AUTHORITIES..........................................................................5

PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS ..............7

INTRODUCTION ....................................................................................11

      A.      BACKGROUND ON SECTION 922(t)(3) ........................................11

      B.      APPLICATION OF SECTION 922(t)(3) TO ALABAMA
               PERMITS .......................................................................12

      C.      PROCEDURAL HISTORY BEHIND ATF'S CHANGED
               POSITION ......................................................................14

STANDARD OF REVIEW ........................................................................20

ARGUMENT

  I.      ATF'S ALABAMA PSA CONFLICTS WITH THE PLAIN TEXT ......22

      A.      Section 922(t)(3) Looks Only to the Face of State Law ....................22

      B.      ATF Now Ignores the Text of Section 922(t)(3), Looking Beyond
               State Law to County Practices ............................................23

      C.      Alabama Agrees with ATF as to the Requirements of State Law and
               Has Attempted to Gain Compliance from Sheriffs .............................25

  II.     ATF'S "CORRECTIVE MEASURES" IMPERMISSIBLY ADD TO
       THE TEXT AND VIOLATE PRINCIPLES OF FEDERALISM ..........27

      A.      Section 922(t)(3) Does Not Permit Penal "Corrective Measures"......27

B.    ATF's Corrective Measures Violate Principles of Federalism and the
Anti-Commandeering Doctrine .......................................................... 29

III.   THE CHALLENGED ACTION VIOLATED THE APA'S
REQUIREMENT OF NOTICE-AND-COMMENT
RULEMAKING ........................................................................................ 33

CONCLUSION .......................................................................................................... 34

# STATEMENT OF LEGAL AUTHORITIES

**18 U.S.C. 922(t)**

> (3) Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if—
> (A)(i) such other person has presented to the licensee a permit that —
> (I) allows such other person to possess or acquire a firearm; and
> (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.... [Emphasis added.]

**Code of Ala. § 13A-11-75**

> (b) Prior to issuance or renewal of a permit, the sheriff shall contact available local, state, and federal criminal history data banks, including the National Instant Criminal Background Check System, to determine whether possession of a firearm by an applicant would be a violation of state or federal law.
> (d) If a person who is not a United States citizen applies for a permit under this section, the sheriff shall conduct an Immigration Alien Query through U.S. Immigration and Customs Enforcement.... A person who is unlawfully present in this state may not be issued a permit under this section. [Emphasis added.]

# INDEX OF AUTHORITIES

## STATUTES

18 U.S.C. Section 922 ........................................................................ *passim*

18 U.S.C. Section 927 ........................................................................32

Alabama Code § 13A-11-75 .............................................................*passim*

Brady Handgun Violence Prevention Act (Pub.L. 103–159, 107 Stat. 1536)...11, 12

## REGULATIONS

63 *Fed. Reg.* 8381 (Feb. 19, 1998) ..........................................................11

63 *Fed. Reg.* 58272 (Oct. 29, 1998)..........................................................33

## CASES

*Bullock v. IRS*, 401 F. Supp. 3d 1144 (D. Mont. 2019)............................33

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) .....................................31

*Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012) ...................30, 31

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082 (9th Cir. 2003) ......................33

*High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185 (11th Cir. 2017)...................21

*Latecoere Int'l, Inc. v. United States Dep't of the Navy*, 19 F.3d 1342
    (11th Cir. 1994) ...............................................................35

*Legal Envtl. Assistance Found. v. United States EPA*, 118 F.3d 1467
    (11th Cir. 1997) ...............................................................21

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).........................29

*New York v. United States*, 505 U.S. 144 (1992)......................................31

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)....................29, 32

*Preserve Endangered Areas of Cobb's History v. United States Army Corps of
    Eng'rs*, 87 F.3d 1242 (11th Cir. 1996)..........................................20

*Printz v. United States*, 521 U.S. 898 (1997).....................................29,30

*Rizzo v. Goode*, 423 U.S. 362 (1976)..............................................32

*Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006) ........................20

*United States v. Chafin*, 808 F.3d 1263 (11th Cir. 2015) ........................21

*Willis v. Winters*, 235 Ore. App. 615 (Or. App. 2010) ..........................22

*Willis v. Winters*, 350 Ore. 299 (Or. 2011) .......................................22, 31

*Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016)........................................................33

*Wyoming ex rel. Crank v. United States*, 2007 U.S. Dist. LEXIS 107992

    (D. Wy. 2007)................................................................................................22

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Plaintiff, Sandra Lee, is a United States citizen.  Compl. § 3; Lee Decl. § 1.

2.    Plaintiff Lee is a resident of Huntsville, Alabama. Compl. § 3; Lee Decl. § 1.

3.    The events or omissions giving rise to this suit occurred in Madison County, Alabama, a county within this district. Compl. §§ 3, 9; Lee Decl. § 3.

4.    Plaintiff Lee has no disqualification that would prevent her from acquiring, keeping, or bearing arms.  Compl. § 3.

5.    Plaintiff Lee is a member of Gun Owners of America, Inc.  Compl. § 3; Lee Decl. § 6.

6.    Plaintiff Lee possesses a valid unexpired Alabama "Permit to Carry Pistol in Vehicle or Concealed on Person" ("CCP").  Compl. § 3; Lee Decl. § 2.

7.    On April 30, 2020, Plaintiff Lee called a federal firearms licensee ("FFL") doing business as "Mr. Big Guns" located in Huntsville, Alabama.  Compl. § 9; Lee Decl. § 3.

8.    Plaintiff Lee inquired with said FFL about purchasing a firearm with her valid unexpired Alabama CCP.  Compl. § 9; Lee Decl. § 3.

9.    However, Plaintiff Lee was advised by the FFL that sale of the firearm using her valid unexpired Alabama CCP could not be completed unless she submitted to a FBI NICS background check, consistent with the ATF's July

22, 2019 Public Safety Advisory to All Alabama Federal Firearms Licensees. Compl. § 9; Lee Decl. § 3.

10. Consistent with ATF instructions, the FFL advised Plaintiff Lee that it could not make the sale, and Plaintiff Lee was unable to purchase a firearm.  Compl. § 9; Lee Decl. § 4.

11. Were it not for the challenged agency action, Plaintiff Lee would, subject to the discretion of the FFL, be able to use her Alabama CCP in lieu of a background check to purchase firearms at a federally licensed firearms dealer, as authorized by 18 U.S.C. § 922(t)(3).  Compl. § 9.

12. Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Suite 202, Springfield, VA 22151.  Compl. § 4.

13. GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under IRC § 501(c)(4).  Compl. § 4.

14. GOA was incorporated in 1976 to preserve, protect, and defend the Second Amendment rights of gun owners.   Compl. § 4.

15. GOA has more than two million members, including residents of the Northern District of Alabama, many of whom possess Alabama CCPs, and who would

seek to use them to purchase firearms but for the challenged agency action. Compl. § 4; Pratt Decl. § 2.

16. Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation, with its principal place of business in Virginia, at 8001 Forbes Place, Suite 202, Springfield, VA 22151. GOF is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under § 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country, including Alabama residents who possess Alabama CCPs and who would seek to use them to purchase firearms but for the challenged action. Compl. § 5; Pratt Decl. § 2.

17. On February 24, 2016, Defendant ATF issued an "Open Letter to All Alabama Federal Firearms Licensees," stating that the Alabama CCP "qualifies as an alternative to the background check requirement," based on the provisions of Alabama Code § 13A-11-75. Compl. §§ 15-16, 18.

18. ATF's 2016 Open Letter instructed Alabama FFLs that, when transferring firearms, they would be permitted to accept Alabama CCPs issued on or after August 1, 2013 in lieu of running a NICS check. Compl. § 17.

19. Alabama Code § 13A-11-75 has remained unchanged, in pertinent part, since that time. Compl. § 18.

20.   On July 22, 2019, ATF issued a "Public Safety Advisory to All Alabama Federal Firearms Licensees" stating that, "**effective immediately, FFLs in Alabama may no longer accept CCP permits as an alternative to a NICS check**." Emphasis original.  Compl. § 19, 28.

21.   Complaint Exhibits A, B, C, and D, being communications to and from ATF, are admissible for the purpose of this motion.

## INTRODUCTION

**A.    Background on Section 922(t)(3).**

On November 30, 1993, President Clinton signed into law the Brady Handgun

Violence Prevention Act (Pub.L. 103–159, 107 Stat. 1536).  *See* Joint Appendix,

ATF000730-740 (hereinafter referenced by Bates numbers).  Generally speaking,

the Brady Act prohibits certain categories of persons from obtaining or possessing

firearms and requires that, before a federally licensed dealer can transfer a firearm,

he first must run a background check through the FBI's National Instant Criminal

Background Check System ("NICS").  *See* 18 U.S.C. Section 922.  However,

because the NICS system had yet to be established in 1993, the Brady Act contained

various interim provisions effective from February 28, 1994 until November 30,

1998.  *See* 18 U.S.C. Section 922(s).  On November 30, 1998, temporary section (s)

expired, and permanent section (t) (known as "permanent Brady") took its place,

including the provision at issue in this case, section 922(t)(3), which provides that a

NICS check is not required if the transferee possesses a qualifying permit:

> (3) Paragraph (1) shall not apply to a firearm transfer between a
> licensee and another person if—
> (A)(i) such other person has presented to the licensee a permit that —
> (I) allows such other person to possess or acquire a firearm;[1] and
> (II) was issued not more than 5 years earlier by the State in which the
> transfer is to take place; and

---

[1]  ATF has always held that a permit "to possess or acquire a firearm" includes a
concealed carry permit.  *See* 63 *Fed. Reg.* 8381 (Feb. 19, 1998).

(ii) **the law of the State provides** that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.... [Emphasis added.]

## B.   Application of Section 922(t)(3) to Alabama Permits.

On October 30, 1998, shortly before the November 30, 1998 effective date of the Brady Act's permanent subsection (t), ATF sent an "Open Letter to All Alabama Federal Firearms Licensees."[2]  The 1998 Open Letter announced the implementation of the permanent NICS system and the Section 922(t)(3) exemption, but opined that "there are no permits in [Alabama] that qualify as an alternative to a NICS check." *Id.* at 2.

Fifteen years later, Alabama changed its law "through a bill that became effective August 1, 2013."  ATF000003.  Alabama SB 286 (enacted May 20, 2013) created a requirement that an Alabama "Permit to Carry a Pistol in Vehicle or Concealed on Person" ("CCP") is not to be issued unless a sheriff first contacts the NICS system and, if the person is not a U.S. citizen, conducts an Immigration Alien Query ("IAQ").[3]  Code of Ala. § 13A-11-75(b) and (d) provide, in pertinent part, that:

---

[2]  https://www.atf.gov/file/84086/download.

[3]  Arguably, the existing Alabama statute already qualified under Section 922(t)(3) even without this 2013 change, since it required a sheriff to "contact available

(b) Prior to issuance or renewal of a permit, the sheriff **shall contact** available local, state, and federal criminal history data banks, including **the National Instant Criminal Background Check System**, to determine whether possession of a firearm by an applicant would be a violation of state or federal law.[4]

(d) If a person who is not a United States citizen applies for a permit under this section, the sheriff **shall conduct an Immigration Alien Query** through U.S. Immigration and Customs Enforcement....  A person who is unlawfully present in this state may not be issued a permit under this section. [Emphasis added.]

The Alabama statute also requires that sheriffs deny pistol permits to anyone prohibited from firearms possession under federal law.  Code of Ala. § 13A-11-75(a)(1)a.

Based on this change to the Alabama statute, on September 28, 2015 then-Attorney General of Alabama Luther Strange wrote to ATF requesting confirmation that the Alabama CCP now qualified as a NICS exemption under Section 922(t)(3).  Compl. Exhibit A.  On February 24, 2016, ATF agreed with the Alabama Attorney General's assessment, issuing an "Open Letter to All Alabama Federal Firearms Licensees" ("2016 Open Letter"), opining that the Alabama CCP now qualified as a NICS alternative under Section 922(t)(3).  Compl. Exhibit B.

---

local, state, and federal criminal history data banks," in line with Section 922(t)(3)'s requirement to "verif[y] ... the information available...."

[4] ATF has always considered a check of the "information available" to be satisfied by "a NICS check."  *See* ATF000765.

Thus, as of February 24, 2016, ATF acknowledged that "the law of the State [of Alabama]" met the criteria set out in Section 922(t)(3).  This language in the Alabama statute *has not changed in any way* since enacted in 2013 and since approved of by ATF in 2016.  In other words, the "law of the State [of Alabama] provides" in 2020 exactly what it did in 2016.  Yet even with *no change* in the Alabama statute, ATF has acted to reverse its 2016 position that the Alabama CCP qualifies under Section 922(t)(3).

### C.    Procedural History Behind ATF's Changed Position.

Shortly after ATF issued its February 2016 Open Letter, the Alabama Attorney General sent a letter to all Alabama sheriffs in March of 2016, notifying them of ATF's decision, informing them of their duties under Section 13A-11-75, and asking them to contact NICS prior to issuing CCPs.  *See* ATF000062-64. Initially, many sheriffs reportedly had problems complying with Section 13A-11-75, including some sheriffs who "didn't have access to NICS."  ATF000063.

Later in 2016, the FBI conducted a tri-annual audit of the NICS process in Alabama, which included an investigation into whether the sheriffs of various Alabama counties were complying with the requirements of Section 13A-11-75 in practice.  *See* ATF000006-8.  More than a full year later, in September of 2017, the

FBI reported to ATF by letter "the results" of its 2016 audit (ATF000006-8)[5] including that, as of June of 2016, "only 45 of the 67 counties were conducting the required NICS background checks" but, by August of 2017, "54 of the 67 counties were conducting the required NICS background checks."   ATF000006.   As of September 28, 2017, Alabama reported that "there are now just 8 sheriffs who are not doing the checks."   ATF000016.

From 2017 through 2019, ATF continued to express concern that some Alabama sheriffs were not conducting NICS checks as required by Section 13A-11-75.  Over that period, numerous referrals were sent by ATF to the sheriffs of various Alabama counties, notifying them of specific instances where persons allegedly prohibited from possessing firearms under federal law nevertheless had allegedly used Alabama pistol permits to obtain firearms.  *See, e.g.*, ATF000034, 35, 37, 39, 41, 45, 65, 180, 200, *etc.*[6]  However, as late as June of 2018, ATF acknowledged

_____

[5]  Counsel for the government reports that ATF never received the 2016 audit itself from the FBI.

[6]  These administrative records are of little-to-no probative value, because the substance has been entirely redacted.  Not only has ATF chosen to redact personal information (like name, address, firearms serial number, *etc.*), but it has also blacked out all the dates, including the date on which an Alabama CCP was obtained, and the date a firearm was obtained using that CCP.  It thus could be expected that any number of these referrals could involve persons who became prohibited persons *after* they obtained an Alabama CCP.  To be sure, the record does contain one report that alleges "[i]n both cases, the pistol permits were issued after felony convictions were entered."  ATF000152.  *See also* ATF000151.  But in

that, in spite of the perceived problems with various local practices by sheriffs, "the [2016] open letter *will likely not be impacted* since it [meaning Section 13A-11-75] meets 922(t) requirements."  ATF000118 (emphasis added).  *See also* ATF000119. Within nine months, however, ATF's position had changed.

On March 21, 2019, the FBI reported again to ATF that "we know of multiple counties **not** running tens of thousands of NICS checks but still issuing" CCPs. ATF000327.  *See also* ATF000328-330.  In response, ATF Division Chief Krissy Carlson replied that she had concerns about "public safety," and recommended that ATF "immediately send the State of Alabama a letter informing them that due to their failure to abide by their our [sic] State statute we are rescinding our Open Letter...." ATF000339.  *See also* ATF000337-342.  ATF Senior Policy Counsel Eric Epstein replied to Chief Carlson.  The content of his email has been redacted but, from the context, it appears that he cautioned that ATF would open itself to "litigation risk" should it decide to revoke Alabama's Section 922(t)(3) exemption

---

other instances, there is no way to draw that conclusion based on what ATF has presented.  In some cases, even ATF is not sure.  *See* ATF000035 ("it is *probable* that this permit was issued prior to [redacted] conviction.") (emphasis added); *cf.* ATF000056 ("it is *possible* this subject may no longer be a prohibited person") (emphasis added).  In other cases, NICS (the system on which the government proposes to rely here) contained bad information.  *See* ATF000280 ("[s]ince the information in NCIC was erroneous, [redacted] was able to pass a NICS check to get his CCP.").

based on nothing more than the local practices of some county sheriffs. ATF000338.[7] However, Chief Carlson overruled his warning, noting that she would rather incur litigation risk "then [sic] to do nothing." *Id.* The ATF Chief of Firearms Industry Programs Branch joined in, contradicting the position he had taken nine months previously, opining that "[e]ven if it's a litigation risk I think it is worth pursuing based on public safety." *Cf.* ATF000337 with ATF000118.

Also in March of 2019, ATF officials became aware that various CCP "application forms" used by certain Alabama counties did "not ask for [an] alien number which is a prerequisite to run a NICS check." ATF000102. ATF noted that "each county may be utilizing various forms," with some not obtaining citizenship and alien information. *Id.* Without asking citizenship questions, ATF rationalized, various county applications were not obtaining the information necessary to run an IAQ check in compliance with Section 13A-11-75(d).

By early 2019, ATF had decided to stop recognizing the Alabama CCP as a NICS alternative under Section 922(t)(3). *See, e.g.*, ATF000353-54. On July 22, 2019, ATF issued a "PUBLIC SAFETY ADVISORY TO ALL ALABAMA FEDERAL FIREARMS LICENSEES." Compl. Exhibit C ("2019 Alabama PSA"). The 2019 Alabama PSA states that "ATF's [prior 2016] determination was based on

---

[7] *See also* key redactions into ATF thinking at ATF000361, ATF000397, and ATF000406-11.

the understanding that a full NICS check would be conducted," and on "the understanding that an Immigration Alien Query (IAQ) would be conducted if a non-U.S. citizen applied for a CCP permit." *Id.* The 2019 Alabama PSA also states that, "ATF has determined that, notwithstanding the express requirements of Ala. Code §13A-11-75, Alabama CCP permits have been, and continue to be, issued to individuals without completion of a NICS check, or after a NICS denial," and that "some Alabama counties have not been requiring non-U.S. citizen CCP permit applicants to submit the information necessary to run the IAQ...." *Id.* The 2019 Alabama PSA concludes that "the standards set forth in the Brady law require us to find that Alabama's CCP permits no longer qualify as a NICS check alternative," and "**effective immediately, FFLs in Alabama may no longer accept CCP permits as an alternative to a NICS check**." (Emphasis original.)

In addition to issuing the 2019 Alabama PSA, the record shows that ATF sent a letter dated July 22, 2019 ("2019 AG Letter") to Alabama Attorney General Steve Marshall, notifying him of ATF's decision to revoke the Alabama Section 922(t)(3) exemption. ATF000676-78. The 2019 AG Letter not only reiterated the bases for the 2019 Alabama PSA and expressed the same general "public safety concern," but also went much further — claiming that, if Alabama wished to again have its permits recognized as Section 922(t)(3) exemptions, "the following *corrective measures* will need to be taken." ATF000677 (emphasis added). First, ATF demanded that "[t]he

State must ensure" that all county sheriffs conduct full NICS and IAQ checks before issuing Alabama CCPs.  ATF000678.  Second, ATF demanded that "[a]ll CCP permits previously issued to individuals found to be prohibited ... must be revoked." *Id.*  Finally, ATF demanded that "[r]easonable efforts [must be taken] to retrieve all firearms from individuals found to be prohibited … under State law."  *Id.*

In February of 2020, the FBI sent ATF "the results of" a 2019 "audit of the [NICS] alternate permit process in Alabama."  ATF000693.[8]  *See also* ATF000694-700.  The FBI's 2019 audit revealed that "[t]he 20 counties responsive to the audit have since began [sic] conducting the required NICS checks on all permits," and "no less [sic] than 52 permits have been revoked thus far...."  ATF000699.

---

[8]  As with the 2016 audit, government counsel advises that ATF did not receive a copy of the FBI audit itself.

## STANDARD OF REVIEW

In this circuit, "[s]ummary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law ... The evidence must be viewed in the light most favorable to the non-moving party." *Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).

When reviewing agency action under the Administrative Procedure Act, "[t]he focal point for judicial review of an administrative agency's action should be the administrative record." *Id.* An agency's "decision may be set aside only if found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." *Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006). Moreover, "[a]lthough the standard of review applied to final agency decisions is deferential, the matter is a little more complicated than that. Under the arbitrary and capricious standard, we must consider whether an agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 1273-74. An agency's "decision is arbitrary and capricious when, among other flaws, 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter

to the evidence before the agency.'" *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1193-94 (11th Cir. 2017).

An agency's decision is similarly invalid if it "is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Id.* at 1193.  When analyzing the meaning of a statute, "we begin with the statute's text.  That is because where the statutory language is clear and unambiguous, we 'presume that Congress said what it meant and meant what it said,' [and] '[o]ur inquiry must cease.'" *United States v. Chafin*, 808 F.3d 1263, 1270 (11th Cir. 2015).  Finally, "'[n]o deference is due to agency interpretations at odds with the plain language of the statute itself.  Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.'" *Legal Envtl. Assistance Found. v. United States EPA*, 118 F.3d 1467, 1477 (11th Cir. 1997) (quoting *Public Employees Retirement Sys. v. Betts*, 492 U.S. 158, 171 (1989)).

## ARGUMENT

## I.      ATF'S ALABAMA PSA CONFLICTS WITH THE PLAIN TEXT.

### A.      Section 922(t)(3) Looks Only to the Face of State Law.

By its express terms, 18 U.S.C. Section 922(t)(3) looks only to whether "the law of the State provides" for the requirement stated in 923(t)(A)(ii).  The Alabama statute clearly meets that requirement, since it requires a NICS check to be run prior to the issuance of any CCP and an IAQ check to be run whenever a person is a non-citizen.  *See* Section 13A-11-75(b) and (d).  Numerous courts have taken this simple and straightforward approach to understanding Section 922(t)(3).[9]  Indeed, Plaintiffs have not found any decision where a court has looked beyond the plain language of a state statute, to local interpretations or implementation of that statute, when analyzing Section 922(t)(3) eligibility.

In 2016, ATF acknowledged that the Alabama "statute was amended to comply with the requirements of 922(t)," and that Alabama "permits issued pursuant

---

[9]  *See Wyoming ex rel. Crank v. United States*, 2007 U.S. Dist. LEXIS 107992, *41 (D. Wy. 2007) ("[t]he relevant 'law of the state' here is Wyoming's CCW permitting statute...."); *see also Willis v. Winters*, 235 Ore. App. 615, 629 (Or. App. 2010) (noting that Section 922(t)(3) "provides ... an exception ... *if the law of Oregon*" meets certain requirements, then looking to "Oregon's concealed handgun licensing *statutes*." (emphasis added)); *see also Willis v. Winters*, 350 Ore. 299, 303-305, 316 (noting that "waiver of the background check depends on the law of the state that issued the permit," and looking at numerous Oregon *statutes* to determine the boundaries of state law).

to Alabama Code § 13A-11-75 ... qualify as alternatives to the background check."
ATF000003; Compl. Exhibit B.  In 2018, ATF officials continued to apply Section
922(t)(3) as written, explaining that, in spite of implementation by local sheriffs, the
CCP's status as a NICS exemption "will likely not be impacted since" Section 13A-
11-75 "meets 922(t) requirements."  ATF000118.  *See also* ATF000119.  And even
in 2019, ATF continued to indirectly admit that the text of Section 13A-11-75 meets
the requirements of Section 922(t)(3), the actions of local sheriffs being taken
"*notwithstanding the express requirements* of Ala. Code § 13A-11-75...."  Compl.
Exhibit C (emphasis added).

The relevant "law of the State" of Alabama has not changed in any way since
2013.  It is only ATF's position as to Alabama's Section 922(t)(3) eligibility that has
changed, based not on the "law of the State," but rather on the implementation of
that statute by local county sheriffs.

**B.**   **ATF Now Ignores the Text of Section 922(t)(3), Looking Beyond State Law to County Practices.**

Recently, ATF has contrived a new standard for measuring compliance with
Section 922(t)(3).  No longer is it good enough that "the law of the State [of
Alabama] requires" NICS and IAQ checks to be run prior to the issuance of CCPs.
Rather, ATF now requires every *county sheriff* to run NICS and IAQ checks in each
and every case, in order for *the state* to be deemed to be in compliance with Section
922(t)(3).  Indeed, ATF purported to revoke Alabama's Section 922(t)(3) exemption

*in spite of* the state's agreement with ATF as to the requirements of Alabama law, and instead because of county sheriffs' "failure to abide by their our [sic] State statute...." ATF000339. *See also* ATF 000337-42. Of course, if Congress had intended to condition Section 922(t)(3) state eligibility on the particular practices of local officials, it would have done so. Yet the statute looks only at the face of "state law" to determine eligibility — the practices of a county sheriff who does not follow state law notwithstanding.

In the past, the agency has wrongly claimed that "ATF is responsible for enforcing the provisions of § 922(t)," and asserted that "[i]t is ATF's responsibility to determine whether a permit qualifies as an alternative to a background check...." ATF000619, ATF000623.[10] *See also* ATF000620-22 and ATF000624-27. On the contrary, the question as to what "the law of the State provides" is a purely legal question. Certainly, ATF can take a position as to whether a particular state's statute qualifies, but there is simply no basis for the agency's position that it is permitted to grant or revoke an exception, or to conduct an investigation and render a decision based on facts uncovered during an FBI "audit." In fact, there is nothing in Section

---

[10] In *Roberts v. DOJ*, 20-cv-10639 (E.D. Mi.), the government was unable to provide any actual source of authority for ATF to make determinations as to Section 922(t)(3) eligibility, or to revoke eligibility of a state's permit. Defendants' Cross-Motion for Summary Judgment at 10; Plaintiffs' Combined Reply to Defendants' Brief in Opposition at 2 n.3.

922(t)(3) which permits a factual predicate to be the basis for any determination of exemption.  Rather, a determination as to whether a particular state statute qualifies under Section 922(t)(3) is based on the four corners of a given state statute, of which the agency's "interpretation" is due no deference.

### C.   Alabama Agrees with ATF as to the Requirements of State Law and Has Attempted to Gain Compliance from Sheriffs.

There is no disagreement between Alabama and ATF as to what "the law of the State provides."  Yet ATF's mandate that Alabama control the actions of its county sheriffs gives the Alabama state legislature control over neither the statute it enacted, nor that statute's Section 922(t)(3) eligibility.  Rather, ATF's application of the statute would put the fate of all Alabama CCPs into the hands of any single, rogue, local official who might not comply with state law (whether intentionally or unwittingly).  Indeed, the FBI reports that at least one prior Alabama sheriff "choose [sic] not to comply" with the state statute, while another "refused to respond" to requests for the FBI audit of his office's practices.   ATF000330, ATF000695.  Understanding Section 922(t)(3) to require perfect local compliance with the requirements of state law undermines the purpose of Section 922(t)(3), which looks only to the face of "the law of the State."  No state with decentralized issuance of permits would have any control over its Section 922(t)(3) compliance under ATF's standard of perfection.

What's more, the state of Alabama has taken numerous steps to attempt to wrangle its 67 counties into compliance with the state statute. For example, in 2016, the Alabama Attorney General sent a letter to all Alabama sheriffs (locally elected constitutional officers) asking them to comply with state law and run NICS checks prior to issuing CCPs. ATF000062-64. In 2017, the Alabama Law Enforcement Agency (ALEA) reported it was "reaching out to the sheriffs" in an attempt to obtain compliance with state law. ATF000016. ALEA also reported that it "had multiple discussions with [the] President of the Sheriff's Association" who, in turn, "presented the issue to many (if not all) of the sheriffs," and even "began calling all sheriffs personally [] who we think are not actively using NICS...." ATF000021, ATF000028.

Here, there is no dispute about the requirements of state law, nor is there any dispute from Alabama officials as to what that law requires. The only point of contention is that certain county sheriffs allegedly are not following state law to ATF's satisfaction. Fortunately, Section 922(t)(3) does not require such an audit of specific local practices; it looks only to the face of the Alabama statute.

## II.    ATF'S "CORRECTIVE MEASURES" IMPERMISSIBLY ADD TO THE TEXT AND VIOLATE PRINCIPLES OF FEDERALISM.

### A.    Section 922(t)(3) Does Not Permit Penal "Corrective Measures."

Section I explains how ATF's 2019 Alabama PSA violates the plain text of Section 922(t)(3) by adding to the statute the requirement that local county officials implement in practice what "the law of the State provides."  But that is not the only way in which ATF has added to the statute.  In its 2019 AG Letter (ATF000676-78), ATF officials dreamt up and imposed their own laundry list of obligations beyond those in the statute:  obligations that are a blatant expansion of the statute.[11]  First, ATF has demanded that "[a]ll CCP permits previously issued to individuals found to be prohibited ... under federal or state law must be **revoked**...."[12]  ATF000678

---

[11]  *See also* ATF000354 ("requiring they [Alabama] take a number of steps to avoid losing their alternative permit status") and ATF000353; ATF000028 ("we have to have strong assurances from ALL sheriffs that not only will they perform the NICS checks, but that they must retroactively perform checks on every currently valid pistol permit"); and ATF000339 (Division Chief Krissy Carlson recommending revocation of the Alabama permit exemption "until 1) they have ran [sic] the 60,000+ identified backgrounds 2) revoked and received those that do not qualify and 3) proven they now have the ability to comply.").

[12]  Nothing in Section 922(t)(3) requires a state to identify and remedy any and all alleged problems that may have happened in the past in order to qualify for a NICS exemption regarding how its permits will be treated in the future.  For example, when ATF recognized Alabama permits as NICS alternatives in 2016, the agency did not require existing permits to be brought into compliance with the new statute.  Rather, ATF simply stated that all permits as of August 1, 2013 would be recognized as NICS alternatives.  *See* Compl. Exhibit B at 1.

(emphasis added).  Second, ATF demanded that "reasonable efforts [must be taken] to **retrieve** all firearms from individuals found to be prohibited from possessing firearms under State law." *Id.* (emphasis added).  Third, for firearms that could not be retrieved by state authorities, ATF demanded that those cases "immediately be **referred** to the local ATF field office." *Id.* (emphasis added).

Making clear that these were demands rather than recommendations or requests, ATF concluded its letter by stating "[u]nless these corrective measures are fully implemented, ATF will be unable to accept Alabama CCP permits as a NICS alternative under the Brady law." *Id.*  Of course, ATF has absolutely no authority to demand that Alabama authorities revoke anything, retrieve anything, or refer anything as a condition of Section 922(t)(3) eligibility.

Interestingly enough, in 1998 ATF considered and rejected the establishment of a similar requirement for revocation of state-issued permits.  As ATF recounted, the then-existing DOJ Office of Policy Development "suggested that ATF should adopt a further condition for State permits ... to identify and revoke permits that have been issued to persons who become subsequently disqualified."  ATF000765-66.  ATF flatly rejected that idea, noting that "[n]o one questions that the States may have authority to revoke their own firearms permits; the question is whether the Brady law provides ATF with the authority to condition the acceptance of permits as Brady alternatives on the existence of an appropriate revocation mechanism." *Id.*

at ATF000766.  ATF answered that question in the negative — "there is nothing in the statutory language that indicates that Congress intended [Section 922(t)(3)] to apply only to permits ... that had appropriate revocation mechanisms."  ATF000768. Indeed, ATF opined that the agency had *no authority to add any* "more stringent requirements" to the statute (ATF000625), stating in 1998 that "'expressio unius est exclusio alterius' ... the plain language of the statute provides that a permit will qualify as an alternative if it meets the conditions set forth in the law."  *See also* ATF000623-27.   There is no mention at all of State revocation procedures. Furthermore, there is *no grant of discretion*[13] to the agency to develop standards for such permits."  ATF000768-69 (emphasis added).

### B.    ATF's Corrective Measures Violate Principles of Federalism and the Anti-Commandeering Doctrine.

It is hard to imagine a more blatant violation of the principles elucidated in *Printz v. United States*, 521 U.S. 898 (1997), and *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), than the "corrective measures" ATF has sought to impose on Alabama.  Indeed, the Supreme Court has observed that "conspicuously absent from the list of powers given to Congress [much less to ATF] is the power to issue direct orders to the governments of the States."  *Murphy v. Nat'l Collegiate*

---

[13]  In other words, the agency concedes that it has no authority to implement Section 922(t)(3), and thus the challenged action is due no deference.

*Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).  Yet here, ATF mandates that, in order to achieve recognition for the Alabama CCP under Section 922(t)(3), Alabama authorities *must revoke* state-issued permits, *must retrieve* firearms from persons prohibited under state law, and *must refer* its citizens to the federal government for prosecution.  ATF000678.

First, ATF has no authority to require Alabama to retrieve firearms or require Alabama to refer those cases to the federal government for prosecution.  *See, e.g., Fletcher v. Haas*, 851 F. Supp. 2d 287, 304 (D. Mass. 2012) ("Congress could not have been more explicit when enacting the federal statute regulating firearms; it made clear that states would retain the authority to regulate firearms possession," pointing to 18 U.S.C. § 927).  As was the case in *Printz*, ATF here "purports to direct state law enforcement officers to participate ... in the administration of a federally enacted regulatory scheme" by requiring state authorities to refer their residents to the federal government for prosecution.  *Id.* at 904.  But as the Court noted in *Printz*, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress," and it certainly is not an Alabama sheriff.  *Id.* at 922.  As in *Printz*, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program ... such

commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 935.

ATF simply cannot require Alabama to participate in federal law enforcement as a condition of Section 922(t)(3) eligibility. *See Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ("allowing the federal government, already nearing the outer limits of its power, to act through unwilling state officials would 'obliterate the distinction' entirely" between "what is national and what is local." *Id.* at 647 (*citing United States v. Lopez*, 514 U.S. 549, 557 (1995)). *See also New York v. United States*, 505 U.S. 144, 188 (1992) ("The Federal Government may not compel the States to enact or administer a federal regulatory program").

Second, ATF has no authority to require Alabama to revoke its own *state*-issued permits or to disarm persons prohibited by *state* law from possessing firearms. *See Fletcher* at 304.   On the contrary, Alabama CCPs are entirely a creature of state law.  Even if ATF has some power to opine whether it thinks certain permits are valid NICS alternatives, it certainly has no power to order the revocation of other state permits it believes are *not* valid NICS alternatives. *See Willis v. Winters*, 350 Ore. 299, 312 (Or. 2011) ("Congress has not enacted a law requiring license denial as a means of enforcing [federal] policy") (all four Oregon courts to consider this issue agreed that the federal government has no control over the issuance of state carry permits).

Moreover, as the U.S. Supreme Court has made abundantly clear, federal courts *absolutely cannot* order state officials to obey, enforce, or conform their conduct to the requirements of state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").  In *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court noted further that when "the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'"  *Id.* at 378.  It seems clear that if a federal court cannot order state officials to enforce state law, then certainly ATF is similarly constrained.

None of the "corrective measures" ATF has imposed on Alabama in 2019 were imposed in 2016, when Alabama CCPs were recognized as NICS alternatives, and there is no legal basis for requiring them now.  On the contrary, ATF's "corrective measures" upset the constitutional balance between state and federal authority.  The Supreme Court has already struck down attempts to coerce state

authorities to enforce federal law, as part of the *same congressional act* that ATF now attempts to hijack to do the same.  ATF may envision itself as the supreme arbiter and enforcer of the nation's gun control laws, but Section 922(t)(3) does not permit the agency to impose whatever conditions and qualifications it deems appropriate for Section 922(t)(3) eligibility.

## III.   THE CHALLENGED ACTION VIOLATED THE APA'S REQUIREMENT OF NOTICE-AND-COMMENT RULEMAKING.

The 2019 Alabama PSA imposes entirely new and additional affirmative requirements on Alabama, including the "corrective measures" discussed above, which do not exist under the statute, and which did not exist under ATF's 1998 notice-and-comment rulemaking (63 *Fed. Reg.* 58272) or its 2016 Open Letter.  That alone makes the 2019 Alabama PSA a legislative rule:  "[l]egislative rules ... create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) (citations omitted).  *See also Bullock v. IRS*, 401 F. Supp. 3d 1144 (D. Mont. 2019).  Nor is the challenged action supported by *Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016), which approved of an ATF Open Letter that imposed no new obligations, but instead merely provided another illustration as to how the prior rule should be applied.  *See Wilson* at 1100.

Here, the challenged action purported to revoke Alabama's CCP as a NICS exemption, unless and until Alabama complied with new obligations that are not

required by existing statutes or regulations.  ATF now purports to require county sheriffs to comply with state law, in order for a state statute to qualify under Section 922(t)(3).  Moreover, ATF has required Alabama to "revoke" licenses, to "retrieve" firearms, and to "refer" criminal cases in exchange for Section 922(t)(3) eligibility. By imposing these additional obligations which are not authorized by statute or regulation, the challenged action constitutes a legislative rule which required notice-and-comment rulemaking.

## CONCLUSION

In 1998, ATF specifically considered and rejected the claim that it resurrects here — that it is permitted to add provisions to the law enacted by Congress, so that a few prohibited persons do not obtain firearms.  In 1998, ATF noted the inherent limitations on its authority, explaining that while "[t]here may be rational policy reasons" to add requirements to the statute, "'rationality is not enough. [ATF] need[s] authority.'"  ATF000768 n.2.  In 1998, ATF noted that "[t]here is no question that the recognition of [state] permits as alternatives to a NICS check *may result in the purchase of firearms by individuals with Federal firearms disabilities*," but admitted that "it appears that this is an *inevitable result of the law*, and not something that ATF can address through the regulations."  ATF000770 (emphasis added).

In 2019, however, ATF repudiated these principles.  ATF now claims that, because an otherwise qualifying state statute may not be properly implemented by local officials *in every case*, and therefore that a few potentially prohibited persons *might* improperly gain access to firearms that they would not otherwise have, ATF has the *carte blanche* authority to add new requirements to Section 922(t)(3).  On the contrary, the agency is tasked with adherence to the statute that Congress wrote, regardless of whether that always provides the results the agency would like to see.

Here, ATF has blatantly expanded the statute in order to assume a power that Congress never gave it — to weigh the *effectiveness* of a *county's* permitting procedures, in determining whether a *state's* permit constitutes an alternative to NICS under Section 922(t)(3).  Because Section 922(t)(3) provides no cover for ATF's actions, the agency has engaged in a "'clear and prejudicial violation of applicable statutes or regulations.'"  *See Latecoere Int'l, Inc. v. United States Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994).

Rather, Section 922(t)(3) provides a black-and-white, cut-and-dry, straightforward legal standard, which looks *only* to the face of Alabama state law.  Such inquiry takes only a few lines of legal analysis, and it is indisputable that the Alabama statute complies.  Since 2016, ATF has admitted that the Alabama statute meets the Section 922(t)(3) test, because it requires that a NICS background check be run prior to the issuance of any CCP, and that an IAQ check be run for non-

citizens.  ATF concerns as to problems with how some local sheriffs may *implement* that statute, and the agency's attempts to stoke fear that a few *potentially* prohibited persons *might* gain access to firearms, are irrelevant and should be ignored.  In fact, as noted above, the FBI's 2020 audit revealed that all 20 audited sheriffs were now running NICS checks, eroding the main basis for ATF's 2019 Alabama PSA (failure to use the NICS system).  ATF000693.

Plaintiffs ask that this Court declare that the Alabama statute, on its face, qualifies as a NICS alternative under Section 922(t)(3), and that valid CCPs may be used by Alabama firearms dealers as an alternative to a NICS background check. Additionally, Plaintiffs ask this Court to declare ATF's actions to the contrary (including the 2019 Alabama PSA and the 2019 ATF letter to the Alabama Attorney General) to be unlawful, and enjoin their enforcement, on the ground that they exceed ATF's statutory authority, because Section 922(t)(3) grants the agency no authority at all.

                    Respectfully submitted,

                    /s/ Reed Martz
        BY:  M. Reed Martz*
                    Freeland Martz, PLLC
                    302 Enterprise Dr., Ste A
                    Oxford, MS 38655
November 16, 2020        Phone: (662) 234-1711
                    reed@freelandmartz.com
                    Alabama Bar No. MAR160
                    *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

On November 16, 2020, I certify that I electronically filed this document with the Clerk of the Court through the ECF System, which will send notification of such electronic filing to all counsel of record registered electronically.


/s/ Reed Martz

BY:   M. Reed Martz*

Freeland Martz, PLLC
302 Enterprise Dr., Ste A
Oxford, MS 38655
Phone: (662) 234-1711
reed@freelandmartz.com
Alabama Bar No. MAR160
*Counsel for Plaintiffs*