# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

SANDRA LEE, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

        Defendants.

Case No. 5:20-cv-00632-LCB

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................... 1

LEGAL BACKGROUND ....................................................................... 2

STATEMENT OF FACTS ...................................................................... 6

A. Defendants' Statement Of Uncontested Material Facts. .................. 6

B. Defendants' Response To Plaintiffs' Statement Of Facts. ............... 9

STANDARD OF REVIEW ................................................................... 10

ARGUMENT ........................................................................................ 13

I.  Plaintiffs Lack Standing To Challenge The 2019 PSA. .................. 13

II. ATF Reasonably Interpreted 18 U.S.C.  § 922(t) And Ala. Code § 13A-11-75 Together To Conclude That Alabama FFLs Must Carry Out NICS Checks. ............................................................................................. 17

   A. ATF Correctly Interprets 18 U.S.C. § 922(t) To Require Parity Between The Background Checks Relied On For The Transfer Of Firearms. .................................................................................... 17

   B. ATF Properly Looked Beyond The Text Of Alabama Law To Determine Whether 18 U.S.C. § 922(t)(3) Is Satisfied. ............... 20

   C. ATF Reasonably Concluded That Alabama State Law Does Not Actually Provide for Parity Between Types of Background Checks. ........... 23

   D. ATF Reasonably Attempted To Address The Shortcomings Of Alabama Law Through Other Means. ......................................... 25

   E. Plaintiffs' Objections To The Alabama AG Letter Are Misplaced. ............. 26

CONCLUSION ..................................................................................... 29

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abramski v. United States,*
  573 U.S 169 (2014). ...........................................................................18

*Alabama v. Ctrs. for Medicare & Medicaid Svcs.,*
  780 F. Supp. 2d 1219 (M.D. Ala. 2011)...............................................12

*Arcia v. Fla. Sec'y of State,*
  772 F.3d 1335 (11th Cir. 2014) ............................................... 14, 17, 18

*Atrium Med. Ctr. v. HHS,*
  766 F.3d 560 (6th Cir. 2014) ...............................................................13

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,*
  781 F.3d 1271 (11th Cir. 2015)............................................................11

*Bochese v. Town of Ponce Inlet,*
  405 F.3d 964 (11th Cir. 2005)..............................................................13

*Christenson v. Harris County,*
  529 U.S. 576 (2000) .............................................................................12

*Clapper v. Amnesty, Int'l,*
  568 U.S. 398 (2013) .............................................................................15

*Corbett v. TSA,*
  930 F.3d 1225 (11th Cir. 2019).............................................................13

*County of Maui, Haw. v. Haw. Wildlife Fund,*
  140 S. Ct. 1462 (2020)..........................................................................20

*Defenders of Wildlife v. Dep't of Navy,*
  733 F.3d 1106 (11th Cir. 2013).............................................................12

*Dobson v. Azar,*
  451 F. Supp. 3d 1346 (S.D. Fla. 2020)..................................................13

*FCC v. Fox Television Stations*,
　556 U.S. 502 (2009) ...................................................................28

*Fla. Fruit & Vegetable Ass'n v. Brock*,
　771 F.2d 1455 (11th Cir. 1985)..................................................11

*Georgia v. Wheeler*,
　418 F. Supp. 3d 1336 (S.D. Ga. 2019) ......................................11

*Green v. Ky. Higher Ed. Assistance Auth.*,
　78 F. Supp. 2d 1259 (S.D. Ala. 1999) .................................. 19, 20

*Hells Canyon Preservation Council v. U.S. Forest Service*,
　593 F.3d 923 (9th Cir. 2010) ......................................................15

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) .......................................................... 13, 14, 15

*Martin v. Soc. Sec. Admin.*,
　903 F.3d 1154 (11th Cir. 2018) ..................................................13

*Miccosukee Tribe of Indians of Fla. v. U.S.*,
　566 F.3d 1257 (11th Cir. 2009)...................................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
　463 U.S. 29 (1983) ............................................................... 11, 28

*Nashville, C. & St. L. Ry. v. Browning*,
　310 U.S. 362 (1940) ...................................................................21

*National Rifle Ass'n ("NRA") v. Reno*,
　216 F.3d 122 (D.C. Cir. 2000)....................................................18

*Perez v. Mortgage Bankers Ass'n*,
　575 U.S. 92 (2015) .....................................................................12

*Robinson v. Sessions*,
　721 F. App'x. 20 (2d Cir. 2018)........................................ 15, 16, 21

*Skidmore v. Swift*,
   323 U.S. 134 (1944) ......................................................................12

*Sterling Distributors v. Patterson*,
   236 F. Supp. 479 (N.D. Ala. 1964) ...............................................22

*Swann v. Sec'y, Georgia*,
   668 F.3d 1285 (11th Cir. 2012) .....................................................15

*Turaani v. Sessions*,
   316 F. Supp. 3d 998 (E.D. Mich. 2018) ........................................15

*Warshauer v. Solis*,
   577 F.3d 1330 (11th Cir. 2019) .....................................................12

*Wilson v. Lynch*,
   835 F.3d 1083 (9th Cir. 2016) .......................................................28

*Wyoming ex rel. Crank v. United States*,
   No. 06-cv-0111, 2007 WL 9735116 (D. Wyo. May 8, 2007) ..........22

## Statutes and Public Laws

18 U.S.C. § 921 ..................................................................................3

18 U.S.C. § 922(d) .............................................................................3

18 U.S.C. § 922(g) ........................................................................3, 26

18 U.S.C. § 922(t) ..................................................................... passim

Ala. Code § 13A-11-75 ............................................................. passim

*Brady Handgun Violence Prevention Act*, Pub. L. No. 103-159, 107 Stat. 1536
   (Nov. 30, 1993) ...............................................................................2

## Rules, Regulations, and Legislative Materials

Federal Rule of Civil Procedure 56 .........................................................................11

25 C.F.R. 25.6(j) ............................................................................................................4

27 C.F.R. § 478.102 .....................................................................................................4

28 C.F.R. § 25.2 ...........................................................................................................19

28 C.F.R. § 25.4 ...........................................................................................................19

*Final Rule, Relating to Implementation of Pub. L. 103-159*, 63 FR 58272 (Oct. 29, 1998) ....................................................................................................................5

*Proposed Rules, Relating to Implementation of Pub. L. 103-159*, 63 FR 8379 (Feb. 19, 1998) ..............................................................................................................4, 5

Report, *Brady Handgun Violence Prevention Act*, H.R. Rep. No. 103-344 (1993).3, 18, 25, 28

Report, *Federal Firearms Amendments of 1966*, S. Rep. No. 89-1866 (1966).........3

## INTRODUCTION

Federal law requires that a federal firearms licensee ("FFL") not transfer a firearm until after a background check is conducted through the National Instant Criminal Background Check System ("NICS"). This requirement may be satisfied by alternative means, namely, if the person acquiring the firearm presents to the FFL a state-issued firearms permit—but only if "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." 18 U.S.C. § 922(t). ATF has long interpreted this language to mean that a state-issued permit qualifies as an alternative only if state law requires state officials to conduct a NICS background check and deny prohibited persons from obtaining state permits in a manner that achieves parity with NICS background checks performed by an FFL at the point-of-sale.

In Alabama, concealed carry permits ("CCPs")[1] are issued by sheriffs, and in 2013, Alabama amended its state law to supposedly require sheriffs to conduct a NICS background check before issuing a CCP. On its face, this amendment to state law appeared to meet the requirement of parity between background checks required for CCPs and background checks performed at FFLs. But after ATF issued guidance to Alabama FFLs in 2016 informing them that Section 922(t)(3) permitted FFLs to accept Alabama CCPs in lieu of performing a separate background check, ATF

---

[1] Alabama law establishes several similar permits: a "concealed pistol permit," Ala. Code § 13A-11-75(f), a "pistol permit," *id.* § 13A-11-75(h), and "a permit . . . to carry a pistol in a vehicle or concealed on or about his or her person." *Id.* § 13A-11-75(a)(1)a. ATF treats all of these equivalently as Alabama CCPs.

learned that the facial requirements of the Alabama statute belie the reality. In truth, many Alabama sheriffs do not interpret Alabama law to require NICS background checks and do not perform such checks. The result is dismaying: tens of thousands of Alabamians carry and perhaps continue to obtain or renew CCPs that were *not* issued pursuant to a NICS check. Accordingly, to fulfill the purpose of the federal background check requirement, ATF issued a Public Safety Advisory to FFLs in July 2019 ("2019 PSA"), instructing FFLs to carry out NICS background checks before completing firearms transfers to holders of Alabama CCPs. *See* ATF000679.

Plaintiffs' claims and motion for summary judgment look exclusively to the text of Alabama law to support an argument that ATF *must* permit FFLs to accept Alabama CCPs as an alternative to NICS checks, while ignoring the evidence of the meaning of Alabama law—the actual practice of Alabama sheriffs—on which ATF relied. The invalidation of the 2019 PSA that Plaintiffs urge would open a loophole that would permit convicted felons, mentally-ill persons, and others who are prohibited by law from owning firearms to acquire firearms from Alabama FFLs. The Court should keep this loophole closed by recognizing that ATF has reasonably interpreted the meaning of state and federal law in order to fulfill the purpose of Section 922(t), and that the 2019 PSA is therefore lawful.

## LEGAL BACKGROUND

Congress passed the Brady Handgun Violence Prevention Act ("Brady Act") to, *inter alia*, "provide for . . . a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm." Pub. L. No. 103-159, 107 Stat. 1536 (1993); ATF000730. The Act's purpose is "to prevent

convicted felons and other persons who are barred by law from purchasing guns from licensed dealers, manufacturers or importers."  H.R. Rep. No. 103-344, at 1 (1993); ATF000701.

The Brady Act is part of an interconnected framework of federal laws regulating the interstate firearm market, which also includes the Gun Control Act of 1968 ("GCA"), as amended, 18 U.S.C. Chapter 44.  The GCA operates to "regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless."  S. Rep. No. 89-1866, at 1 (1966); *see* 18 U.S.C. § 921 *et seq*.  Among its provisions, the GCA designates several categories of persons for whom it is unlawful to "receive" or "possess" "any firearm," including those convicted of felonies, fugitives from justice, unlawful users of controlled substances, those who have been committed to a mental institution, and those who have been convicted of a misdemeanor crime of domestic violence.  18 U.S.C. § 922(g).  These prohibitions are paired with a ban on the knowing transfer of firearms to such persons. *See* 18 U.S.C. § 922(d).

A core part of the Brady Act is 18 U.S.C. § 922(t)(1), which requires that an FFL not transfer a firearm to a non-licensee until after a background check is conducted through NICS (which is administered by the Federal Bureau of Investigation ("FBI")) and receives information that the transfer would not violate federal or state law.  18 U.S.C. § 922(t)(3) establishes a limited exception to this mandatory background check, providing that 18 U.S.C. § 922(t)(1):

> shall not apply to a firearm transfer between a licensee and another person if-
> (A)(i) such other person has presented to the licensee a permit that—

(I) allows such other person to possess or acquire a firearm; and

(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.

18 U.S.C. § 922(t)(3). This provision is commonly known as the "alternate permit" requirement because state permits that satisfy 18 U.S.C. § 922(t)(3) serve as alternatives on which FFLs can rely instead of carrying out a background check through NICS.[2] However, the acceptance by FFLs of permits that satisfy Section 922(t)(3) is at all times discretionary on the part of the FFL: any FFL may choose *not* to accept a state-issued permit and to require a NICS background check in any or all instances.

Prior to the November 30, 1998 effective date of Section 922(t), ATF issued a Notice of Proposed Rulemaking ("NPRM") regarding the implementation of the NICS background check requirement. *See* 63 FR 8379 (Feb. 19, 1998); ATF000741 *et seq.* In the NPRM, ATF explained that "the information available" as referenced in section 922(t)(3)(A)(ii) would "include the NICS database[s]" and therefore, that permits issued on or after November 30, 1998 "will be valid alternatives . . . only if the State officials conduct a NICS check on all permit applicants." ATF000742; 63

---

[2] States with NICS-alternate permits have a state statute that authorizes access to the NICS Indices, which comprise three database systems. The states run a search, and information (not the actual records) from the three systems is returned to the state to review, conduct additional research, and make a determination. The FBI does not investigate or determine whether the permit holder is prohibited, it simply provides access to the databases. *See* 25 C.F.R. 25.6(j).

FR 8381.  The NPRM also explained that for alternate permits, the "critical issue is . . . whether the State has conducted a background check on that individual to ensure that the individual is not prohibited from possessing a firearm."  *Id*.  Finally, the NPRM stated that "[i]f a State does not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives," and committed that "ATF will notify licensees in each State whether or not permits issued by that State will suffice as alternatives."  *Id*.

After considering comments to the NPRM, ATF subsequently issued a final rule adopting into ATF's regulations the requirement that a NICS check be performed.  *See* 63 FR 58272 (Oct. 29, 1998); ATF000749 *et seq.*; 27 C.F.R. § 478.102(d)(1)(iii).  The final rule reaffirmed that if the State "did not disqualify all individuals prohibited under Federal law," after conducting a NICS check, "the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady Law."   63 FR 58275; ATF000752. Acknowledging that states may be burdened by the expense or administrative difficulty of carrying out NICS background checks, ATF noted that neither the statute nor regulations "require States to establish or administer permit systems at all," and simply "set forth certain standards that State permits must meet in order to be recognized as valid Brady alternatives."  *Id*.

In 2002, pursuant to a directive by the Department of Justice, NICS checks began to "include a mandatory Immigration Alien Query (IAQ)," in connection with "regulations implementing the statutory provisions prohibiting the possession or receipt of firearms by nonimmigrant aliens."  ATF000634 (July 23, 2002 Open

Letter to Multiple States).  As a result, ATF instructed states with alternative permits that they "must include the [IAQ] query for non-citizens as part of the NICS check," and that permits that did not require IAQ checks would "not satisfy the standards set forth" for alternate permits.  *Id*.

## STATEMENT OF FACTS

A.    <u>DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS</u>

1.    On September 28, 2015, the Alabama Attorney General ("AG") requested that ATF recognize Alabama CCPs as NICS alternatives, explaining why he believed statutory amendments dated August 1, 2013 met the criteria.  *See* ATF000001-02.

2.    After a "call [with] the AG's Office" to discuss the letter, ATF000003, ATF issued an "Open Letter to All Alabama FFLs" in February 2016 notifying Alabama FFLs that, pursuant to 18 U.S.C. § 922(t)(3), they may transfer a firearm to the holder of an Alabama permit without carrying out a NICS background check at the point-of-sale.  *See* ATF000004 ("2016 Open Letter").

3.    In the 2016 Open Letter, ATF explicitly limited the acceptance of such permits to those "issued . . . on or after August 1, 2013," and indicated that the 2016 Open Letter reflected its review of the applicable state law, Ala. Code § 13A-11-75(b), and Alabama's CCP as of that date.  ATF000004.

4.    After the 2016 Open Letter, Alabama sheriffs "flood[ed]" the Alabama Attorney General's office "with calls . . . stating they didn't have access to NICS." ATF000063.

5.    A 2016 FBI audit found that, as of June 2016, "only 45 of the 67 counties were conducting" NICS background checks.  ATF000006.

6.     As of August 2017, 13 Alabama counties continued to issue permits without NICS background checks.  *See id.*

7.     In September 2017, the Alabama Law Enforcement Agency ("ALEA") "reach[ed] out to the sheriffs" to try to assist ATF in ensuring that background checks are conducted, but sheriffs in 8 counties continued to issue permits without NICS background checks.  ATF000016; *see also* ATF000021, ATF000028.

8.     In 2019, Jefferson County, Alabama did not even require that CCP applicants provide the alien number needed to run an IAQ check.  *See* ATF000102-05.

9.     FBI and ATF have identified numerous prohibited persons who have purchased or attempted to purchase firearms from Alabama FFLs without a NICS check, relying on Alabama CCPs.  These include:

   a.  A convicted rapist who "attempted to purchase 2 handguns."  ATF000035.

   b.  Two individuals who "presented valid Jefferson County" CCPs and received handguns from an FFL, both of whom had previously pleaded guilty to felony charges.  ATF000152.

   c.  A "convicted felon [who] possesses a Russell County pistol permit," and purchased a handgun despite a denied NICS check sometime before March 27, 2019.  ATF000217-18; *see* ATF000227-28.

   d.  A person "convicted of multiple felonies . . . and had served time in prison, including one parole revocation," who attempted to purchase a firearm using a Macon County CCP, but was denied when the FFL ran a voluntary NICS background check that returned "DENIED."  ATF000282.

   e.  A "foreign national" who purchased a firearm, relying on a Jefferson County CCP, who failed to return the firearm once discovered.  ATF000303; *see* ATF000308.

   f.  A person in Montgomery County failed a NICS background check at an FFL,

went to the Montgomery County Sheriff's Department and obtained a [CCP,] then returned to [the FFL] and attempted to purchase the pistol again." ATF000180.

g. A person in Jackson County who was unable to complete an FFL background check, then "proceeded to the . . . [s]heriff and was issued a [CCP]." ATF000292.

10.    An ATF survey of nearly thirty Alabama counties revealed that those counties issued over 200,000 permits without carrying out the required NICS background checks between August 1, 2013 and early 2019. *See* ATF000327-ATF000330.  The ATF survey also discovered:

a. Marengo County "claim[ed] [to] have NICS and [to be] running" background checks, even though no NICS checks had been performed. ATF000329.

b. Blount County was "unaware" of the NICS check requirement. *Id.*

c. Cherokee and Morgan County had "no access" to NICS at all.  ATF000330.

11.    ATF's Division Chief, Firearms and Explosives Industry, recommended that, "[i]n an effort to best serve public safety," ATF should "immediate[ly] send the State of Alabama a letter . . . rescinding [the 2016] Open Letter and advising the FFLs to conduct a NICS check" until Alabama could ensure that prohibited persons did not obtain firearms.  ATF000339.

12.    ATF recognized that rescinding the 2016 Open Letter may pose a "litigation risk," but determined it was "worth pursuing based on public safety."  ATF000337.

13.    On July 22, 2019, ATF issued the 2019 PSA.  *See* ATF000679.

14.    On July 22, 2018, ATF also sent a letter to the Alabama Attorney General ("2019 AG Letter"), *see* ATF000676-78, explaining that "the continuing failure of

some Alabama sheriffs to complete full NICS checks prior to issuance of CCP permits creates an unacceptable risk to public safety." This letter instructed Alabama that it should undertake four corrective measures to ensure that Alabama CCPs could again be accepted as NICS alternatives: (1) "ensure that CCP permits are only issued . . . as required by Ala. Code § 13A-11-75"; (2) complete NICS checks on those "issued CCP permits without a NICS check"; (3) revoke permits "issued to individuals found to be prohibited" through those NICS checks; and (4) "take reasonable efforts to retrieve all firearms" from prohibited persons.  ATF000678.

B.     DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

1.     Defendants do not dispute Ms. Lee's citizenship.

2.     Defendants do not dispute Ms. Lee's residency.

3.     Defendants do not dispute that the venue for this suit is in Madison County.

4.     For purposes of this motion only, Defendants do not dispute that Ms. Lee has no disqualification that would prevent her from lawfully acquiring, keeping, or bearing arms under federal law.

5.     Defendants do not dispute Ms. Lee's membership in Gun Owners of America ("GOA").

6.     Defendants do not dispute that Ms. Lee possesses a valid, unexpired Alabama CCP.

7.     Defendants do not dispute that, on April 30, 2020, Ms. Lee called an FFL doing business as "Mr. Big Guns" in Huntsville, Alabama.

8.     Defendants do not dispute that Ms. Lee inquired with the FFL about whether it would accept her CCP in lieu of a NICS background check.

9.      Defendants do not dispute that the FFL informed Ms. Lee that it would require an FBI NICS background check.  Defendants dispute whether the FFL informed Ms. Lee that the 2019 PSA is the reason the FFL would require a NICS check.

10.     Defendants deny that: 1) Plaintiff Lee attempted to purchase a firearm; 2) an FFL attempted to "make [a] sale" to Plaintiff Lee; and 3) Plaintiff Lee was "unable to purchase a firearm."

11.     Defendants do not dispute that the 2016 PSA stated that an Alabama FFL is permitted to accept an Alabama CCP in lieu of a background check; however, such acceptance was at all times subject to the text of 18 U.S.C. § 922(t)(3) and the discretion of the FFL.

12.     Defendants do not dispute the identity of GOA or its business information.

13.     Defendants do not dispute the tax-exempt status of GOA.

14.     Defendants do not dispute the purpose or incorporation date of GOA.

15.     Defendants do not dispute GOA's membership numbers, that GOA members possess Alabama CCPs, or may seek to use such CCPs in lieu of a background check. Defendants dispute that any GOA member who may lawfully acquire a firearm has been unable to acquire a firearm.  Defendants also dispute that a GOA member could predict whether an FFL would exercise its discretion to require a NICS check even absent the 2019 PSA.

16.     Defendants do not dispute the alleged facts about Gun Owners Foundation.

17.     Defendants do not dispute that ATF issued the 2016 Open Letter as alleged.

18.     Defendants do not dispute Plaintiffs' description of the 2016 Open Letter.

19.     Defendants do not dispute that the text of the Alabama statute has not changed.

20.     Defendants do not dispute that ATF issued the 2019 PSA as alleged.

21.     Defendants do not dispute the admissibility of the exhibits to the Complaint.

## **STANDARD OF REVIEW**

Under the Administrative Procedure Act ("APA"), "a court may 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observation of procedure required by law." *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1348 (S.D. Ga. 2019) (quoting 5 U.S.C. § 706(2)). APA challenges "are properly adjudicated on cross-motions for summary judgment." *Id.* (citing *Fla. Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985)). In this review, "[h]owever, the standards set forth in Federal Rule of Civil Procedure 56 do not apply." *Id.* (citation omitted). Rather than examine "whether there is a genuine issue of material fact," the court "instead turns directly to the question of the validity of the challenge." *Id.* (citation omitted).

In reviewing whether an agency's actions are "arbitrary and capricious," courts "ask whether the agency 'examined the relevant data and articulated a satisfactory explanation for its action.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). This standard is "exceedingly deferential," and the Court may not "substitute [its]

judgment for the agency's as long as its conclusions are rational." *Defenders of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013).  Thus, an agency action can be held arbitrary and capricious only "where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Miccosukee Tribe of Indians*, 566 F.3d at 1264)).

The APA distinguishes between "legislative rule[s] for which notice and comment rulemaking is required" and interpretive rules, which state "'an agency's construction of a statute that has been entrusted to the agency to administer' and do[] not modify or add to a legal norm 'based on the agency's own authority.'" *Ala. v. Ctrs. for Medicare & Medicaid Svcs.*, 780 F. Supp. 2d 1219, 1229 (M.D. Ala. 2011) (quoting *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2019)); *see Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) ("interpretive rules are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers") (internal quotations omitted).  Although such interpretations "do not warrant *Chevron*-style deference, . . . [they] are entitled to respect under [the Supreme Court's] decision in *Skidmore v. Swift*, 323 U.S. 134 [1944]." *Christenson v. Harris County*, 529 U.S. 576, 587 (2000).  Under this standard, "an agency's statutory interpretation receives deference 'corresponding to the thoroughness

evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Dobson v. Azar*, 451 F. Supp. 3d 1346, 1355 (S.D. Fla. 2020) (quoting *Martin v. Soc. Sec. Admin.*, 903 F.3d 1154, 1159 (11th Cir. 2018)). Courts "look to the statute's text and design" and whether the interpretation is "consistent with congressional purpose" to decide whether the agency's reading is correct. *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 567 (6th Cir. 2014) (quotations omitted).

## ARGUMENT

### I.    Plaintiffs Lack Standing To Challenge The 2019 PSA.

"[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Corbett v. TSA*, 930 F.3d 1225, 1228 (11th Cir. 2019) (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)).  "[A] court is not free to opine in an advisory capacity about the merits of a plaintiff's claim" because Article III limits the judicial power to "cases or controversies." *Bochese*, 405 F.3d 974.  As the party "invoking federal jurisdiction," plaintiffs "bear[] the burden of establishing" standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To do so, they must demonstrate: (1) "an 'injury in fact'—an invasion of a legally protected interest which is [both] . . . concrete and particularized . . . and actual or imminent, not conjectural or hypothetical"; (2) that the injury is "traceable to the challenged action of the defendant and not . . . the result of the independent action of some third party"; and

(3) that it is "likely," not "speculative, that the injury will be redressed by a favorable decision."  *Id.* at 560-61 (internal quotations omitted).  To have standing on behalf of its members, an organization like GOA must show that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose," and the litigation does not "require[] the participation of individual members in the lawsuit."  *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014).

Plaintiffs here have not alleged an injury sufficient to give rise to Article III standing.  Ms. Lee alleges that, because of the 2019 PSA, she cannot "use her Alabama concealed carry permit in lieu of a background check to purchase firearms at federally licensed firearms dealers," and that she learned this by telephoning an FFL and asking "about purchasing a firearm with her" CCP.  Compl. ¶¶ 3, 9.  This allegation, on its own, does not give rise to any injury because Ms. Lee does not allege she would be denied or delayed in her purchase of a firearm.  Ms. Lee states in the Complaint that she is "a law-abiding person [who] has no disqualification that would prevent her" from passing a NICS background check.  If so—and Defendants do not contest this for the purposes of this motion—there is no reason to believe that Ms. Lee's ability to acquire a firearm would be impaired—or even delayed—as a result of her inability to use an Alabama CCP to purchase a firearm.  Therefore Ms. Lee has not been "injured" in any meaningful way.

Indeed, Ms. Lee does not even allege she has suffered the minor inconvenience of visiting an FFL, attempting to use her CCP to purchase a firearm, and being turned away—only that she placed a phone call to inquire about what

would happen if she refused a NICS check.[3]  Ms. Lee's "general displeasure" with her inability to use her Alabama CCP and disagreement with ATF's interpretation simply "is not enough to establish injury under Article III." *Hells Canyon Preservation Council v. U.S. Forest Service*, 593 F.3d 923, 930 (9th Cir. 2010).  The conclusion that Ms. Lee has not suffered an injury is reinforced by the conclusions of other courts that, unless a firearms transaction is delayed or denied, the mere act of undergoing a background check cannot give rise to standing.  *See, e.g.*, *Robinson v. Sessions*, 721 F. App'x 20, 22 (2d Cir. 2018) (no injury where plaintiffs did not allege "that they were denied firearms or they suffered delay in purchase"); *compare Turaani v. Sessions*, 316 F. Supp. 3d 998, 1007 (E.D. Mich. 2018) (finding injury from "three-day delay and . . . den[ial] [of] his request to purchase the gun" following NICS background check).

Even if Ms. Lee had adequately alleged an injury, she has not demonstrated that such an injury is traceable to any action by ATF.  "[A]n injury is not fairly traceable to the actions of a defendant if caused by the 'independent action of some third-party not before the court.'"  *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012) (quoting *Lujan*, 504 U.S. at 560)).  Here, the acceptance of a valid alternate permit is entirely discretionary on the part of an FFL, which can still choose

---

[3] Defendants do not concede that Ms. Lee would satisfy the requirements of Article III standing merely by visiting an FFL, asking to use her CCP to purchase a firearm, and refusing to undergo a NICS background check.  Ms. Lee alleges that she would be eligible to purchase a firearm if she underwent a NICS check, so she may not establish Article III injury by merely refusing to do so and then alleging she cannot obtain a firearm.  *See Clapper v. Amnesty, Int'l*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

to run a NICS background check if, at the point-of-sale, the FFL decides one is warranted.  Here, because Ms. Lee only made a phone call and never presented herself to Mr. Big Guns to try to purchase a firearm, she cannot plausibly allege that Mr. Big Guns would not have exercised its independent judgment to run a NICS background check even absent the 2019 PSA.  Traceability is therefore lacking.

For similar reasons, GOA—an organization existing "to preserve, protect, and defend the Second Amendment rights of gun owners," Compl. ¶ 4—cannot satisfy the requirements of organizational standing.  As explained above, Ms. Lee lacks standing, and GOA does not provide any specific evidence of injury to any other GOA member.  Although GOA states that it has "many" members "who are residents of the Northern District of Alabama, who possess Alabama concealed carry permits, and who would use them to purchase firearms, but for the challenged agency action," Compl. ¶ 4, this claim, like Ms. Lee's allegations, does not demonstrate that any member has been injured.  As explained above, the mere fact that a person is subject to a background check, without disruption to his or her ability to purchase a firearm, does not constitute "injury-in-fact."  *See Robinson*, 721 F. App'x 22.  Nor does GOA provide any indication to suggest there is a likelihood that a law-abiding GOA member would walk away from an FFL when denied the ability to use only an Alabama CCP to complete a transaction.  To the contrary, logic suggests that a law-abiding member committed to exercising the Second Amendment rights germane to GOA's purpose would instead complete the transaction by undergoing a NICS check.  GOA has not shown that any of its members would have standing to sue in

their own right, and thus cannot establish standing.  *See Arcia*, 772 F.3d 342.[4]

## II. ATF Reasonably Interpreted 18 U.S.C.  § 922(t) And Ala. Code § 13A-11-75 Together To Conclude That Alabama FFLs Must Carry Out NICS Checks.

The 2019 PSA explains that, in light of the widespread failure by Alabama sheriffs to carry out NICS background checks and IAQ checks, ATF no longer believes it is correct to interpret Ala. Code § 13A-11-75 as a State law that "provides that such a permit is to be issued *only* after an authorized government official has *verified* that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." 18 U.S.C. § 922(t)(3) (emphasis added); *see* ATF000679, ATF000676.  The PSA further explains that ATF reached this conclusion in light of "the standards set forth in the Brady law" and that statute's "public safety" purpose.  ATF's conclusions are reasonable and consistent with law.  ATF000679.

### A. ATF Correctly Interprets 18 U.S.C. § 922(t) to Require Parity Between The Background Checks Relied On For The Transfer Of Firearms.

ATF's longstanding interpretation of 18 U.S.C. § 922(t)(3) is that the statute requires that state law provide "parity between the background check required of [those holding alternate permits] and the NICS check undergone by other purchasers of firearms."  ATF000765, ATF Memorandum, Qualification of Permits as Alternatives to NICS Check (Oct. 8, 1998).  Under this interpretation, a state-issued permit qualifies as an alternate permit only if "the permittee has been subjected to

---

[4] The single paragraph mentioning plaintiff Gun Owners Foundation ("GOF")—a "legal defense and educational foundation"—does not contain any allegations describing an injury to GOF by the 2019 PSA.  *See* Compl. ¶ 5.

the same background check that he would get if he attempted to purchase a firearm without a permit," *id*., *i.e*., a NICS check and accompanying IAQ check.

This interpretation of 18 U.S.C. § 922(t) is reasonable in light of the structure and purpose of the statute.  "[T]he very purpose of the Gun Control and Brady Acts . . . [is] to ensure that individuals not authorized to possess firearms are unable to purchase them."  *National Rifle Ass'n* ("*NRA*") *v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000); *see* H.R. Rep. No. 103-344, at 1 (1993) (statute is designed "to prevent convicted felons and other persons who are barred by law from purchasing guns"). The "statute establishes a detailed scheme to enable the [FFL] to verify . . . whether a potential buyer may lawfully own a gun," including by having the FFL "determine whether the potential purchaser is for any reason disqualified from owning a firearm" through a background check. *Abramski v. United States*, 573 U.S.169, 172 (2014).  The Brady Act accomplishes this purpose by generally requiring that, prior to a firearms sale, the FFL "contacts the [NICS] system," 18 U.S.C. § 922(t)(1), and obtains a "Proceed" indicator, meaning that the NICS contains no information that the purchaser is prohibited.  ATF's reading of the statute to require parity between point-of-sale background checks and alternate-permit background checks fulfills this purpose.  Plaintiffs' contention that the text of state law is definitive, regardless of whether the state actually has systems in place to implement that law, on the other hand, would "virtually repeal . . . [the Brady Act's] core provisions," *Abramski*, 573 U.S. at 179-80, and should be rejected.

The structure of the Brady Act likewise confirms that ATF's interpretation of the statute to require parity among background checks is reasonable.  Like the FFL

background check requirement, the alternate permit provision is also situated in 18 U.S.C. § 922(t), and it directly references 18 U.S.C. § 922(t)(1). *See* 18 U.S.C. § 922(t)(3) ("Paragraph (1) [18 U.S.C. § 922(t)(1)] shall not apply to a firearm transfer . . . if"). These provisions "are to be read in pari materia and harmonized," *Green v. Ky. Higher Ed. Assistance Auth.*, 78 F. Supp. 2d 1259, 1264 (S.D. Ala. 1999), to provide comparable means of accomplishing the statutory purpose—that a background check be conducted prior to any firearms transfer from an FFL.

Under Plaintiffs' interpretation, prohibited persons could circumvent FFL background checks by obtaining a state CCP—even after they have already been informed that they may not permissibly purchase a firearm, creating a huge loophole and undermining the purpose of the statute. ATF's experience in Alabama demonstrates that such abuse is not merely hypothetical. In one instance in 2018, after an individual's NICS background check at an FFL returned as "DENIED," the person "went to the Montgomery County Sheriff's Department and obtained a [CCP,] then returned to [the FFL] and attempted to purchase the pistol again," clearly trying to game the shortcomings in Alabama's CCP law. ATF000180. A similar scenario occurred in Jackson County, where the Sheriff's Department "is relying on an NCIC check to determine eligibility . . . [and] is not running a NICS check."[5]

---

[5] A NICS check includes a search of three databases, the National Crime Information Center (NCIC), which contains records of wanted persons, subjects of protection orders and other persons who pose a threat to officer and public safety; the Interstate Identification Index (III), which provides access to criminal history records; and the NICS Indices, which contain information on prohibited persons as defined in 18 U.S.C.§ 922(g) or (n). *See generally* 28 C.F.R. §§ 25.2, 25.4. As such, an NCIC check is only one part of a NICS check and would not identify

ATF000292.  There, an FFL received a "DELAY" notification from NICS, at which point the individual "proceeded to the Jackson County Sheriff and was issued a [CCP]."  *Id.*; *see also* ATF000287 (example from Conecuh County).

These examples help demonstrate that ATF reasonably adopted a requirement of parity between background checks for state-issued permits and NICS background checks conducted by FFLs in order for state permits to qualify for Section 922(t)(3). The parity requirement avoids creation of a loophole that would entirely undercut the purpose of the Brady Act.  ATF's interpretation is therefore reasonable.  *See County of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (a reading that "would open a loophole allowing easy evasion of the statutory provision's basic purposes . . . is neither persuasive nor reasonable").

### B. ATF Properly Looked Beyond The Text Of Alabama Law To Determine Whether 18 U.S.C. § 922(t)(3) Is Satisfied.

In determining that Alabama CCPs are not issued pursuant to a law that "provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law," 18 U.S.C. 922(t)(3), ATF looked not only to the text of state law,[6] but to whether Ala.

---

those with, *inter alia*, convictions for felonies or misdemeanor crimes of domestic violence, or those committed to a mental institution.

[6] Contrary to a claim in Plaintiffs' section header—which is not repeated in the text of Plaintiffs' brief—ATF did not "ignore[] the text of Section 922(t)(3)" in the 2019 PSA.  Ps Br. at 23.  To the contrary, the 2019 PSA explicitly acknowledged that "the express requirements of Ala. Code § 13A-11-75" require "completion of a NICS check" and the denial of a permit "after a NICS denial."  ATF000679.

Code § 13A-11-75 satisfies the "public safety" purpose and "the standards set forth in the Brady law." ATF000679. In their motion, Plaintiffs contend that ATF has improperly "weigh[ed] the effectiveness of a county's permitting procedures" in concluding that Alabama CCPs do not satisfy Section 922(t)(3), Mem. in Support of Ps. Mot. for S.J. at 35, ECF No. 22-1 ("Ps Br."); *see id.* at 22-23. Not so. ATF has looked to the practices of Alabama sheriffs to determine whether Alabama law, as understood by Alabama officials, provides for parity between FFL and CCP background checks, as required by the text and purpose of the Brady Act. *See Nashville, C. & St. L. Ry. v. Browning*, 310 U.S. 362, 369 (1940) ("It would be a narrow conception . . . to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it").

In determining whether parity is achieved between FFL background checks and alternative permit background checks, ATF has always looked to sources beyond the text of a state statute to understand the meaning of state law. For example, prior to the effective date of 18 U.S.C. § 922(t)(3), ATF directed its field offices to "quer[y]" states "to determine if their requirements for issuing permits will qualify the permit" as an alternative under the Brady Act. ATF00759, ATF000761-62. ATF explained at the time that this determination could be made only through "discuss[ions] . . . with the State representatives," and not "simply [by] examin[ing] the laws of the various States." ATF000762. Similarly, in 2004, ATF asked states with alternate permits to "send a written response to ATF, explaining how [the] State

21

licensing authority complies with the minimum requirements" under 18 U.S.C. § 922(t)(3).  ATF000621.  And ATF reiterated in 2018 that its "[f]ield counsel" are to analyze alternate permits by "correspond[ing] with the State entity" about the requirements of State law.  ATF000871; *see* ATF000871-ATF000876.

Plaintiffs cite several state and federal judicial opinions that rely on state statutes to interpret what "the law of the State provides" in the context of Section 922(t)(3) to suggest that ATF should not look beyond "the plain language of [the] state statute." Ps. Br. at 22 & n.9.  However, those opinions do not require rejecting ATF's approach of looking to the practices of Alabama sheriffs.  None of those cases involved a situation where the practices of state officials differed dramatically from the plain text of state law, as is the case here, so they provide no reason to forbid ATF from relying on extra-textual sources, as Plaintiffs seek.  Moreover, the sole federal case cited by Plaintiffs, *Wyoming ex rel. Crank v. United States*, No. 06-cv-0111, 2007 WL 9735116 (D. Wyo. May 8, 2007), emphasized the reasonably broad "range of authority given to [ATF] by Congress" to make interpretations under the GCA, *id.* at *12 (internal quotations omitted), contrary to Plaintiffs' strained suggestion that ATF lacks "authority . . . to make determinations" of the type made in the 2019 PSA.  Ps. Br. at 24 & n.10.  In any case, none of the opinions cited by Plaintiffs is binding on this Court.   *See id.* at n.9.

22

## C. ATF Reasonably Concluded That Alabama State Law Does Not Actually Provide for Parity Between Types of Background Checks.

The 2019 PSA explains that, in light of the determinations by Alabama sheriffs that state law does not require them to conduct NICS background checks and IAQ searches, Alabama law does not mean what its text says. *Cf. Sterling Distributors v. Patterson*, 236 F. Supp. 479, 483-84 (N.D. Ala. 1964) (if the state officials "vested by the . . . Code of Alabama with plenary authority to enforce such statutes . . . [have] determined not to do so . . . the law . . . has become a dead letter"). ATF therefore reasonably concluded that Alabama CCPs are not issued pursuant to a State law that "provides that such a permit is to be issued only after" a NICS background check and IAQ verification.   18 U.S.C. § 922(t)(3); 27 C.F.R. § 478.102(d)(1)(iii); *see* ATF000679-680.

ATF's conclusion is based on extensive and widespread evidence that Alabama law is not providing for background checks commensurate with those performed by FFLs at the point-of-sale.  As the administrative record demonstrates, upon enactment of Ala. Code § 13A-11-75, numerous sheriffs notified the Alabama Attorney General that "they didn't have access to NICS" and therefore could not conduct background checks commensurate with those at an FFL.  ATF000063. According to an FBI audit, nearly one-third of Alabama counties—22 out of 67— were not conducting NICS background checks before issuing CCPs in June 2016. *See* ATF000006.  The widespread failure to conduct background checks for CCP holders has long continued, with 13 Alabama counties consistently issuing permits

without NICS background checks in August 2017. *See id.* Many Alabama counties audited by FBI in February 2019 still exhibited shortcomings, including twenty counties issuing permits without conducting "the required IAQ" immigration check as part of the NICS background check.  ATF000697; *see* ATF00693-99.  As a consequence, Alabama counties had issued a total of over 200,000 permits without NICS background checks by early 2019.  *See* ATF000327-ATF000330.  The evidence that Alabama law does not provide parity between CCP background checks and FFL background checks is thus widespread and overwhelming, not the result of Plaintiffs' hypothetical "single, rogue, local official," or an unreasonable "standard of perfection."  Ps. Br. at 25.  Rather, because Alabama law widely fails to prevent "convicted felons and other persons who are barred by law from purchasing guns from licensed dealers, manufacturers or importers" from making such purchases, it does not fulfill the purpose of the Brady Act.  H.R. Rep. No. 103-344, at 1.

As the administrative record reflects, the failure of Alabama law to provide for NICS and IAQ checks has, predictably, led to multiple prohibited persons nevertheless being able to acquire firearms from FFLs—precisely what the Brady Act was enacted to prevent.  At least three ineligible individuals relied on Jefferson County CCPs to do so: an ineligible foreign national and two individuals who previously pleaded guilty to felony charges.  *See* ATF000152; ATF000303, ATF000308.  With a Russell County CCP, a convicted felon purchased a handgun despite failing a NICS background check.  *See* ATF000218, ATF000227-28.   If

24

Ala. Code § 13A-11-75 really provided that "a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law," as 18 U.S.C. § 922(t)(3) requires, these individuals would not have been able to obtain firearms.

### D. ATF Reasonably Attempted To Address The Shortcomings Of Alabama Law Through Other Means.

Prior to issuing the 2019 PSA, ATF attempted to assist Alabama in ensuring that Alabama state law satisfied the public-safety purpose of the Brady Act by helping the state government ensure that its CCPs are "issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law," as required by Section 922(t)(3).   However, these measures failed.

The administrative record explains that, in this effort, "ATF worked closely with Alabama's Attorney General's office to provide training to Sheriffs on steps necessary to comply with the NICS/IAQ requirements."  ATF000675 (ATF talking points on Alabama alternate permit requirement).   ATF obtained "full[] cooperat[ion]" from Alabama state authorities in conducting compliance training, and state officials "continued discussions" with ATF "throughout 2018 and into 2019."  *Id.*  But in 2018—two years after the issuance of the 2016 Open Letter, numerous counties still had "not attended NICS training."  ATF000043-044.  In 2019, multiple Alabama counties had "NEVER" conducted a NICS check at all,

despite issuing tens of thousands of CCPs since the 2016 Open Letter. *See* ATF000329-ATF000330 (results of pre-audit questionnaire identifying Chilton, Clarke, Morgan, and Cherokee as such counties). Indeed, the preparations for a 2019 NICS audit revealed that some counties "did not know [NICS access] was required" in sheriff's offices, while others did "[n]ot use NICS due to [im]proper training." ATF000330.

After ATF's attempts to help Alabama failed, ATF decided to "advis[e] the FFLs to conduct a NICS check" rather than relying on CCPs as alternate permits. ATF000349; *see* ATF000433. This advice—the 2019 PSA—had the immediate positive effect of preventing prohibited persons from acquiring firearms. Within hours of its issuance, while ATF officers carried out an inspection of an FFL, a customer "came in to purchase a firearm" using an Alabama CCP, noting that he had "purchased many firearms using his permit." ATF000682 (email from ATF Birmingham area supervisor to Director of ATF Industry Operations). On this occasion, in compliance with the 2019 PSA, the FFL ran a NICS check, which returned "DENIED," based on a misdemeanor conviction of domestic violence ("MCDV"), so the FFL denied the requested purchase. *Id.*; *see* 18 U.S.C. § 922(g)(9).

**E. Plaintiffs' Objections To The Alabama AG Letter Are Misplaced**.

Plaintiffs contend that the July 22, 2019 AG Letter demonstrated the invalidity of the 2019 PSA, arguing that the AG Letter imposes "impermissibl[e]" corrective measures on Alabama and "violate[s] principles of federalism." Ps. Br. at 27. These allegations misunderstand the AG letter and do not cast doubt on the validity of the

26

2019 PSA. At the outset, Plaintiffs fail to account for the implicit distinction between the first item on the list and the second and third items. *See* ATF000678 (AG Letter). The first item—that Alabama "ensure that CCP permits are only issued after . . . a full NICS check, including the IAQ," *id.*,—merely restates the statutory requirement in Section 922(t)(3). In other words, once this condition is met, the statute provides that CCP permits issued after that date qualify for the alternate permit exception. The second and third items apply only in connection with "previously issued" CPLs, *see id.*, and are thereby applicable only if Alabama wishes to have previously-issued CPLs accepted as alternate permits prospectively, not as "a condition of Section 922(t)(3) eligibility" for future permits to be accepted, as Plaintiffs allege.[7] Ps. Br. at 28. Nothing obligates ATF to offer Alabama the opportunity to retroactively cure the problems with these permits, and nothing obligates Alabama to do so. Thus, ATF did not violate the statute or principles of federalism by suggesting the second and third corrective measures to Alabama's AG.

As to the fourth item, specifying that the State "must take reasonable efforts to retrieve all firearms from individuals found to be prohibited from possessing firearms," ATF000678, this should be an unobjectionable public safety measure

---

[7] As an example, Plaintiffs contend that "ATF has no authority to require Alabama to revoke its own *state*-issued permits . . . it believes are *not* valid NICS alternatives." Ps. Br. at 31. Although Plaintiffs would be correct in the abstract, it is equally true that for FFLs to be confident that previously-issued state permits reflect the successful completion of a NICS check, those state permits issued to a person who would *fail* a NICS check must be removed from circulation. Any other approach would obstruct the Brady Act's purpose of "prevent[ing] convicted felons and other persons who are barred by law from purchasing guns from licensed dealers." H.R. Rep. No. 103-344 at 1.

regardless of whether ATF correctly phrased it in mandatory, instead of hortatory, terms.  The importance of this step is obvious: to the extent that Alabama identifies convicted felons, persons committed to mental institutions, domestic violence misdemeanants, or other prohibited persons who possess firearms, the State should of course take reasonable steps to retrieve those firearms to mitigate the risk to public safety posed by firearms in the hands of presumptively-dangerous persons.

Plaintiffs rely on the same misunderstanding of the corrective actions in support of their claim that the APA required that the 2019 PSA be issued through notice-and-comment rulemaking.  See Ps. Br. at 33.  Because Alabama may obtain prospective acceptance of its CCPs as alternate permits simply by ensuring that its law satisfies the statutory requirement that Alabama officials have "verified that the information available . . . does not indicate that possession of a firearm . . . would be in violation of law" before permits are issued, 18 U.S.C. § 922(t)(3), the 2019 PSA does not "add[] to the statute" any "new and additional affirmative requirements," as Plaintiffs allege.  Ps. Br. at 27.  Rather, as a simple application of the meaning of Section 922(t)(3) to Alabama state law, the 2019 PSA, like the 2016 Open Letter, is interpretive in nature, not legislative, and so notice-and-comment rulemaking is not required.[8]  *See Wilson v. Lynch*, 835 F.3d 1083, 1098-1100 (9th Cir. 2016).

Plaintiffs also contend that the items set forth in the AG Letter are inconsistent with ATF's actions "in 2016, when Alabama CCPs were recognized as NICS

---

[8] It is also not the case that ATF's change in interpretation between the 2016 Open Letter to the 2019 PSA requires notice-and-comment rulemaking, *see* Compl. ¶¶ 70-71, because the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

alternatives." Ps Br. at 27 n.12; *id.* at 32.  Not so.  In the 2016 Open Letter, ATF explicitly limited the permits to be accepted as NICS alternatives to those issued after August 1, 2013, the date when ATF—at that time—believed that Alabama law began to meet the requirements of Section 922(t)(3).  *See* ATF000004.  There is nothing contradictory about limiting any future recognition of Alabama CCPs to the dates *after* Alabama law begins to meet the requirements of Section 922(t)(3), unless appropriate steps are taken to retroactively bring the permits issued under Alabama law into compliance with Section 922(t)(3).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and judgment should instead be granted to Defendants.


DATED this 16th day of December, 2020.


Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director


*/s/ Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530

Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*

# CERTIFICATE OF SERVICE

On December 16, 2020, I certify that I electronically filed this document with the Court by means of electronic transmission through the ECF system, which will send notification of such electronic filing to all counsel of record registered electronically.

/s/ Eric Soskin
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*