FILED

2021 Feb-08  PM 02:01
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SANDRA LEE** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:20-cv-00632-LCB** |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I.     Plaintiffs Lack Article III Standing ............................................................2

     A.     Plaintiff Lee Fails to Allege Injury in Fact ...........................................2

     B.     Plaintiff Lee Fails to Demonstrate Traceability ...................................6

     C.     GOA Lacks Associational Standing .....................................................8

II.    Defendants Reasonably Interpreted 18 U.S.C. § 922(t) and Alabama
     Code § 13A-11-75 Together to Conclude That Alabama FFLs Must
     Carry Out NICS Checks .............................................................................9

     A.     The 2019 PSA Reasonably Interprets 18 U.S.C. § 922(t)(3) ...............9

     B.     ATF Is Not Limited to the Text of the State Statute in
           Determining Whether Alabama's Law Meets the
           Requirements of Section 922(t)(3) ....................................................14

     C.     ATF Reasonably Determined That Alabama State Law Does
           Not Actually Provide for Parity Between Types of
           Background Checks..............................................................................16

     D.     Plaintiffs Misplace Their Objections to the Alabama AG Letter .......18

CONCLUSION ...................................................................................................20

## INTRODUCTION

Federal law requires that a federal firearms licensee ("FFL") not transfer a firearm until after a background check is conducted through the National Instant Criminal Background Check System ("NICS").  This requirement may be satisfied by alternative means, namely, if the person acquiring the firearm presents to the FFL a state-issued firearms permit—but only if "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law."  18 U.S.C. § 922(t)(3).

As explained in Defendants' opening brief, in 2016, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") informed Alabama FFLs that they could accept Alabama concealed carry permits ("CCPs") as alternatives to NICS checks.  Since then, however, ATF has learned that many Alabama sheriffs do not interpret state law to require NICS checks and do not perform such checks.  As a result, tens of thousands of Alabamians carry (and perhaps continue to obtain or renew) CCPs that were not issued pursuant to a NICS background check. Accordingly, ATF issued a Public Safety Advisory to Alabama FFLs ("2019 PSA"), explaining that CCP holders are not exempt from NICS checks.  ATF's action is reasonable, proper, and consistent with law, as a court considering a parallel case recently concluded. *Roberts v. U.S. Dep't of Justice*, 2020 WL 7396316 (E.D. Mich.

1

Dec. 17, 2020).  Plaintiffs' challenge thus should be rejected.  As a threshold matter, however, the Court need not even reach the merits of Plaintiffs' claims because Plaintiffs lack standing to sue.  The Court should therefore dismiss this case, or enter summary judgment for Defendants.

## ARGUMENT

## I.   Plaintiffs Lack Article III Standing.

### A.   Plaintiff Lee Fails to Allege Injury in Fact.

To establish standing, a plaintiff must show (1) it "ha[s] suffered an 'injury in fact'' that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) a "causal connection between the injury" and the challenged action of the defendant; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted).  As explained previously, Plaintiffs fail to satisfy the injury and traceability requirements of standing.  Defs.' Cross-Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ. J. at 13-17, ECF No. 26 ("Defs.' MSJ").

A plaintiff "cannot manufacture standing merely by inflicting harm on [herself] based on [her] fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013) (citation omitted).  But that is just what Plaintiff Lee attempts here.  The injury she alleges is an inability

2

to acquire a firearm.  *See* Compl. ¶ 9, ECF No. 1.  But she specifically alleges that she is "a law-abiding person [who] has no disqualification that would prevent her" from passing a NICS background check.  *Id*. ¶¶ 3, 9.  If correct—which Defendants do not contest here—then there is no reason to believe that her ability to acquire a firearm would be impaired or delayed as a result of her inability to use an Alabama CCP to purchase a firearm.  Instead, following a NICS check, she would be able to acquire a firearm.  Thus, Plaintiff Lee's allegation that because of the 2019 PSA, she cannot "use her Alabama [CCP] in lieu of a background check to purchase firearms at federally licensed firearms dealers," *id*. ¶ 3, does not show that she has sustained a legally cognizable injury.

Plaintiff Lee may not manufacture standing merely by refusing to undergo a NICS check and then alleging that she may not obtain a firearm.[1]  Indeed, numerous courts have rejected the contention that simply undergoing a NICS background check constitutes a legally cognizable injury, and Plaintiffs have provided no reason for this Court to deviate from the weight of authority.  *See Robinson v. Sessions*, 721

---

[1] A plaintiff lacks standing if her choices include an alternative that will not cause injury.  *See, e.g.*, *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 617 (D.C. Cir. 2001) (per curiam) (because rule gave utility companies a choice between filing a proposal to participate in a particular type of organizational structure or submitting an alternative filing, and "none of the Utilities' injuries will come to fruition if they opt to make an alternative filing," their alleged injuries were "inadequate to give rise to an injury in fact"); *Fire Equip. Mfrs. Ass'n v. Marshall*, 679 F.2d 679, 682 n.5 (7th Cir. 1982) ("[P]etitioners cannot allege an injury from one of the options where they can choose another which causes them no injury.").

F. App'x 20, 23-24 (2d Cir. 2018) (plaintiffs alleging that NICS checks utilized

inappropriate information lacked standing because they failed to "allege. . . that they

were denied firearms or they suffered delay in purchase");[2] *Clark v. Lynch*, 213 F.

Supp. 3d 1347, 1351-53 (D. Kan. 2016) (plaintiff lacked standing to enjoin

government from conducting NICS check on him before purchasing firearm, despite

"alleg[ation] that he has twice been refused permission to obtain a firearm" after

undergoing NICS checks, where he did "not allege facts showing more than a sheer

possibility that he will be determined ineligible in the future"); *Kuntz v. Dep't of*

*Justice*, 2020 WL 6322858, at *9 (D.N.D. Mar. 6, 2020) (no injury where plaintiff

underwent NICS check, but "the record [did] not contain any evidence showing

denied responses to his attempted firearms purchases"), *adopted*, 2020 WL 6324341

(D.N.D. Mar. 24, 2020); *cf. Turaani v. Sessions*, 316 F. Supp. 3d 998, 1007 (E.D.

---

[2] Plaintiffs' attempt to distinguish *Robinson*, Pls.' Opp. to Defs' MSJ and Reply Supp. Pls.' MSJ at 6 n.8 ("Pls.' Opp."), fails because Plaintiffs "improperly conflate[] the standing and merits inquiries." *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020). The merits inquiry in *Robinson* was the legality of ATF's "subject[ing] potential firearm purchasers to background checks that cross-reference their personal information with the Terrorist Screening Database ('TSDB')." *Robinson*, 721 F. App'x at 21. The court never reached this issue because the plaintiffs lacked standing. *See id.* at 23-24 ("There is no evidence that any of these appellants were unable to purchase a firearm, were delayed in purchasing a firearm, or were listed on the TSDB such that their information was allegedly compromised.") (footnote omitted). But if simply *undergoing* a background check had constituted injury in fact, then the *Robinson* plaintiffs would have possessed standing, because all alleged that they would undergo NICS checks. *See Robinson v. Sessions*, 260 F. Supp. 3d 264, 266-67 (W.D.N.Y. 2017) ("Plaintiffs allege that each Plaintiff 'has completed' the form that initiates an NICS background check . . . and that each Plaintiff 'wants to continue' to purchase firearms through federally licensed dealers.").

Mich. 2018) (finding injury from "three-day delay and . . . den[ial] [of plaintiff's] request to purchase the gun" following NICS check).[3]

In any event, Plaintiff Lee does not even allege that she has visited an Alabama FFL, attempted to use her CCP to purchase a firearm, and has been turned away—merely that she placed a phone call to *ask* about the hypothetical possibility of what *would* happen if she were to refuse a NICS check.  Defs.' MSJ at 14-15. Such an allegation does not suffice to establish injury in fact.  Plaintiffs' response that the State of Alabama was at the time under a stay-at-home order, Pls.' Opp. at 2-3, misses the mark because, as Plaintiffs concede, that order defined "firearm and ammunition manufacturers and retailers" as "essential public services."  *See* id. at 2 n.5.  In any event, the issue is not that Plaintiff Lee made a phone call instead of an in-person visit to an FFL; it is that she does not allege that she has formed any concrete plans to purchase a firearm using her CCP, but merely a hypothetical "wish" that she might one day do so.  *See* Compl. ¶ 9 (asserting that plaintiff "would like" to visit the FFL "for the purpose of purchasing a firearm," and "wished" to do so by using her CCP, but not that she had made any plan to do so).  The Supreme

---

[3] The sole federal case cited by Plaintiffs that purportedly suggests to the contrary is a district court opinion regarding a preliminary injunction that lacks persuasive authority because it has been stayed by the Court of Appeals.  *See Rhode v. Becerra*, 2020 WL 2049091 (9th Cir. Apr. 24, 2020) (staying lower court decision).  The remainder are state court opinions, *see* Pls.' Opp. at 7 n.9, which are irrelevant because "[s]tanding to sue in any Article III court is, of course, a federal question which does not depend on the party's prior standing in state court."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (citation omitted).

Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted). Thus, a complaint that simply sets forth a conceivable future scenario in which the plaintiff could suffer harm does not establish an injury in fact. Because Plaintiff fails to allege an imminent injury, she lacks Article III standing.[4]

## B. Plaintiff Lee Fails to Demonstrate Traceability.

Plaintiff Lee also fails to satisfy the traceability requirement of standing. In addition to showing injury in fact, a plaintiff must demonstrate that her alleged injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted).

Here, Plaintiff Lee's alleged harm—her inability to acquire a firearm—is not fairly traceable to Defendants because even absent the existence of the 2019 PSA, the FFL that she contacted could have exercised its independent judgment to run a NICS background check. *See Turaani*, 316 F. Supp. 3d at 1008-09. In *Turaani*, a firearms dealer allegedly refused to sell a firearm to the plaintiff, despite being

---

[4] Nor do Plaintiffs cite any contrary authority. *See* Pls.' Opp. at 3. Not only do *Morgan v. Bill Vann Company*, 2011 WL 6056083, at *7 (S.D. Ala. Dec. 6, 2011), and *Ohio v. Roberts*, 448 U.S. 56 (1980), have nothing to do with Article III standing, they do not even mention the word "standing" or the term "injury in fact."

6

legally entitled to do so, after FBI agents allegedly informed the dealer that the plaintiff was under federal investigation. *Id.* at 1005-06. The court held that the plaintiff lacked traceability because the dealer's "voluntary and independent actions have caused him harm, not Government conduct." *Id*. at 1008. The court explained that because "Turaani may legally possess a firearm and . . . was legally able to complete the firearm transaction once three days had passed from the delay response," the "constructive denial" of his ability to purchase was "solely the result of the store proceeding with an abundance of caution or, as the Sixth Circuit has stated, going 'above and beyond' the law," which "is insufficient to adequately allege standing." *Id*. at 1008-09 (citation omitted).

Similarly, here, there is no dispute that Plaintiff Lee may legally possess a firearm, but it is entirely speculative whether an FFL would accept her CCP or instead "go 'above and beyond' the law" by deciding to run a NICS check, even without the ATF Public Safety Advisory. "Accordingly, [she] has not plausibly alleged that [her] inability to purchase a gun . . . is fairly traceable to Government action." *Id*. at 1009. Moreover, contrary to Plaintiffs' contention, from the mere fact that *some* Alabama FFLs, including the FFL she contacted, have accepted CCPs without conducting NICS checks, it does not follow that *all* dealers have done so or would do so in every instance. Pls.' Opp. at 4-5. Indeed, because Plaintiff Lee never presented herself to the firearms dealer she contacted, but only made a hypothetical

inquiry about what might happen if she were to do so, she cannot plausibly allege that the dealer would not have decided to "go above and beyond the law" by conducting a NICS check even if the PSA had never been issued.  She thus fails to establish traceability.

### C.    GOA Lacks Associational Standing.

To bring suit on behalf of its members, an organization must prove, *inter alia*, that "its members would otherwise have standing to sue in their own right."  *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1219-20 (11th Cir. 2020) (citation omitted).  As explained above, Plaintiff Lee lacks standing. Moreover, Plaintiff Gun Owners of America ("GOA") fails to provide any specific evidence of injury to any other GOA member.  Defs.' MSJ at 16-17.

Although GOA contends that it has "many" members "who are residents of the Northern District of Alabama, who possess Alabama concealed carry permits, and who would use them to purchase firearms, but for the challenged agency action," Compl. ¶ 4, this claim—like Plaintiff Lee's allegations—does not demonstrate that any member has suffered injury.  As explained above, the mere fact that a person is subject to a NICS check, without disruption to his or her ability to purchase a firearm, does not constitute injury in fact.  *See Robinson*, 721 F. App'x at 23-24.  Because

GOA fails to show that its members would otherwise have standing to sue in their own right, it lacks associational standing.[5]

## II. Defendants Reasonably Interpreted 18 U.S.C. § 922(t) and Alabama Code § 13A-11-75 Together to Conclude That Alabama FFLs Must Carry Out NICS Checks.

### A. The 2019 PSA Reasonably Interprets 18 U.S.C. § 922(t)(3).

Federal law generally requires that an FFL initiate a background check through the FBI-administered NICS system prior to any firearms transfer it conducts. *See* 18 U.S.C. § 922(t). Congress has permitted—but not required—FFLs to accept a state-issued firearms permit as an alternative to initiating a background check. *See id*. § 922(t)(3)(A). Not all state-issued permits qualify, however. As relevant here, a state permit may be accepted only if "the law of the State provides that such a permit is to be issued only after an authorized government official has *verified* that the information available to such official does not *indicate* that possession of a firearm . . . would be in violation of law." *Id*. § 922(t)(3)(A)(ii) (emphasis added).

As explained, ATF has long interpreted Section 922(t)(3) to require state law to provide "parity between the background check required of [persons holding

---

[5] As in *Robinson*, Plaintiffs' argument here that "if the Court finds that they do not have standing, Defendants' conduct could not be challenged" "is both legally and factually flawed." *Robinson*, 260 F. Supp. 3d at 275; *see* Pls.' Opp. at 7, 8-9. "First, it is well established that the argument that 'no one would have standing to sue' is not itself a reason to find standing." *Robinson*, 260 F. Supp. 3d at 275 (quoting *Clapper*, 568 U.S. at 420). Second, finding that Plaintiffs lack standing "does not shield Defendants from judicial review" but instead "merely requires, consistent with the irreducible, constitutional minimum requirements of standing, that a plaintiff seeking judicial review demonstrate [injury] by the challenged conduct." *Id*.

alternate permits] and the NICS check undergone by other purchasers of firearms."
Defs.' MSJ at 17 (quoting ATF000765).  Under this interpretation, a state-issued
permit only qualifies as an alternative permit if "the permittee has been subjected to
the same background check that he would get if he attempted to purchase a firearm
without a permit," *i.e.*, a NICS check and accompanying Immigration Alien Query
("IAQ") check.  *Id*. at 17-18 (citation omitted).  This longstanding interpretation "is
consistent with the text, design, and purpose of the Brady Act, and is therefore
persuasive."  *Roberts*, 2020 WL 7396316, at *8; *see also* Defs.' MSJ at 18-19.
Moreover, this parity requirement avoids the creation of a loophole that would
entirely undercut the statute's purpose.  *See Roberts*, 2020 WL 7396316, at *8
("Defendants' interpretation ensures 'parity' between firearm sales completed with
a Brady alternate and those completed with a NICS check at the point of purchase—
where the FBI, not state officials, are responsible for research.") (footnote omitted);
*see also* Defs.' MSJ at 19-20.  Absent this requirement, prohibited persons could
circumvent FFL background checks simply by obtaining a state CCP—an abuse that
ATF's review of the practice of Alabama sheriffs has documented.  *See* Defs' MSJ
at 19-20.  For these reasons, ATF's interpretation of the statute is reasonable.

        Though Plaintiffs challenge this conclusion, their arguments are unpersuasive.
First, Plaintiffs incorrectly contend that courts may not consider the purpose of a
statute in determining whether a particular interpretation is reasonable.  Pls.' Opp.

at 12-15.[6]  To the contrary, it is well established that courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (citation omitted); *see also United States v. DBB, Inc*., 180 F.3d 1277, 1283 (11th Cir. 1999) ("When interpreting an ambiguous statute, a court should consider the purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as to effectuate and not destroy the spirit and force of the law and not to render it absurd.") (citation omitted).

Nor does *In re Hedrick*, 524 F.3d 1175 (11th Cir. 2008), cited by Plaintiffs, undermine this principle.  That case declined to follow the lead of the First and Sixth Circuits in "revising" a bankruptcy code provision "by importing a different standard from another part of the statute." *Id*. at 1187.  But ATF's statutory interpretation neither makes any such request of the Court nor asks that it "interpret a statute contrary to the plain meaning of its words." *Id*.  Rather, ATF has interpreted an ambiguous statute in a manner that is consistent with its structure and that furthers its purpose.  Such an interpretation is reasonable.

---

[6] Though Plaintiffs rely heavily on a legal treatise in support of their argument, a "treatise is not binding authority on this court." *Pettco Enters., Inc. v. White*, 162 F.R.D. 151, 155 (M.D. Ala. 1995).  Nevertheless, even that treatise recognizes the following interpretive canon: "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."  Antonin Scalia & Bryan A. Garner, *Reading Law* 63 (2012); *see also id*. ("This canon follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness.").  That canon favors ATF's interpretation here.

Second, Plaintiffs fail to demonstrate that ATF's interpretation is at odds with the statute's plain text. Pls.' Opp. at 18-21. Initially, as in *Roberts*, Plaintiffs "argue that the existence of Brady alternates and the fact that they are valid for five years undermines the notion that Congress intended an 'airtight' background check system." *Roberts*, 2020 WL 7396316, at *9 n.19 (citation omitted); *see* Pls.' Opp. at 14-15, 19. But as that court concluded, Plaintiffs' argument is meritless because "a permit is a Brady alternative only if it 'allows [the permittee] to possess or acquire a firearm,'" and it thus "seems quite unlikely that Congress expected states to allow convicted felons or other prohibited persons to keep their permits." *Roberts*, 2020 WL 7396316, at *9 n.19 (quoting 18 U.S.C. § 922(t)(3)(A)(i)(I)). "Furthermore, [ATF's] opinion that certain violations were 'inevitable does not require [it] to ignore the intent of Congress or excuse obvious noncompliance." *Id*. Plaintiffs' contrary argument is thus unavailing.[7]

Additionally, ATF's interpretation of Section 922(t)(3) as requiring Alabama "to determine whether, based on the 'information available'—principally, a NICS

---

[7] Moreover, Plaintiffs cite no authority supporting their contention that ATF's statutory interpretation is unreasonable simply based on the raw number of prohibited persons that the NICS audit identified as having attempted to circumvent the NICS background requirement. Pls.' Opp. at 12 n.13. The text of the statute provides that Section 922(t)(3)(A) extends to *any manner* in which "possession of a firearm . . . would be in violation of law," and the examples identified in the NICS audit demonstrate that the potential for abuse is backed by concrete evidence. ATF may utilize such evidence in showing the reasonableness of its interpretation. *Cf. Roberts*, 2020 WL 7396316, at *9 ("[F]ederal authorities were not required to go the extra step and determine whether the five [state permits] issued resulted in a prohibited person acquiring a firearm.") (footnote omitted).

check—a [CCP] applicant is prohibited from possessing a firearm under federal or state law" "is consistent with the text, design, and purpose of the Brady Act, and is therefore persuasive." *Roberts*, 2020 WL 7396316, at *8; *contra* Pls.' Opp. at 20-21. After all, the very "purpose of the Gun Control and Brady Acts . . . [is] to ensure that individuals not authorized to possess firearms are unable to purchase them." *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000). The "statute establishes a detailed scheme to enable the [FFL] to verify . . . whether a potential buyer may lawfully own a gun," including by having the FFL "determine whether the potential purchaser is for any reason disqualified from owning a firearm" through a NICS check. *Abramski*, 573 U.S. at 172. ATF's reading of the statute to require parity between point-of-sale background checks and alternate-permit background checks fulfills this statutory purpose. It is also consistent with the statutory structure.

Like the FFL background check requirement, the alternate permit provision is situated in the same sub-provision—18 U.S.C. § 922(t)—and it directly references Section 922(t)(i). *See* 18 U.S.C § 922(t)(3) ("Paragraph 1 [18 U.S.C. § 922(t)(i)] shall not apply to a firearm transfer . . . if. . . "). These provisions "can be harmonized *in pari materia*," *Gallardo ex rel. Vassallo v. Dudek*, 963 F.3d 1167, 1179 n.15 (11th Cir. 2020), to provide comparable means of accomplishing the legislative purpose— that a background check be conducted before any firearms transfer from an FFL. *See* Scalia & Garner, *Reading Law*, at 252 ("Statutes *in pari materia* are to be

13

interpreted together, as though they were one law."); *Abramski*, 573 U.S. at 179 n.6 ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context."). Plaintiffs' proffered construction would both ignore this canon and be absurd—prohibited persons would be able to circumvent background checks by obtaining a state CCP, even after they have already been informed they may not permissibly purchase a firearm. Because the parity requirement avoids creating such a massive statutory loophole and undermining the statute's purpose, ATF's interpretation is reasonable. *See County of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (an interpretation that "would open a loophole allowing easy evasion of the statutory provision's basic purpose . . . is neither persuasive nor reasonable"); *Abramski*, 573 U.S. at 179 n.6 (explaining that a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (citation and internal punctuation omitted).

> **B.    ATF Is Not Limited to the Text of the State Statute in Determining Whether Alabama's Law Meets the Requirements of Section 922(t)(3).**

Plaintiffs assert that the 2019 PSA erred by looking to the practice of Alabama sheriffs to determine whether state law—as understood by Alabama officials—provides for parity between FFL and CCP background checks, as required by the

text and purpose of the Brady Act.  Pls.' Opp. at 15-18.  But "'the law of the State' does not refer to statutory law alone.  Undefined terms in a statute must be given their 'natural and ordinary meaning,' for which '[d]ictionaries provide a helpful proxy.'"  *Roberts*, 2020 WL 7396316, at *9 (citation omitted); *accord Spencer v. Specialty Foundry Prod. Inc*., 953 F.3d 735, 740 (11th Cir. 2020) ("To determine the ordinary meaning of an undefined statutory term, we often look to dictionary definitions for guidance.") (citation omitted).  "Unsurprisingly, Merriam-Webster offers an expansive definition of 'law,'" and therefore, "the ordinary meaning of 'law' would seem to include the practices and interpretations of state officials charged with executing or implementing a statute."  *Roberts*, 2020 WL 7396316, at *9 (citation omitted).  Moreover, the "purpose and design of the Brady Act support this interpretation" because if "'the law of the State' refers only to statutory law, then § 922(t)(3) would, in effect, allow states to feign compliance with the Brady Act by enacting statutes that they had no intention of enforcing—and, according to Plaintiffs, [ATF] would be powerless to intervene."  *Id*.  "Congress could not have intended such a helpless regime."  *Id*. (footnote omitted).

   *Roberts* thus supports ATF's longstanding practice of looking beyond the statute to state officials, rather than  merely examining state statutory law divorced from context.  *See* Defs.' MSJ at 21-22.  18 U.S.C. § 922(t)(3) directs ATF to what "the law of the State provides," without limiting that law to the face of the state

15

statute, as Plaintiffs insist.  And although Plaintiffs have cited interpretations of Section 922(t)(3) by other courts that looked to the text of state law, *see* Pls.' Opp. at 23 n.21, Plaintiffs provide no authority to suggest that ATF is forbidden from considering Alabama officials' interpretations of state law by examining their actual practices.  As explained previously, none of the cited cases involved a situation where (as here) the practices of state officials differed dramatically from the plain text of state law.  Defs.' MSJ at 22.  Moreover, Plaintiffs' reliance on *Wyoming ex rel. Crank v. United States*, 2007 WL 9735116 (D. Wyo. May 8, 2007)—the sole federal case they cite—"is not warranted."  *Roberts*, 2020 WL 7396316, at *9.  As the *Roberts* court explained, that case "did not consider or decide the interpretive issue raised here, and to the extent that the opinion is persuasive, *Wyoming* ultimately agreed with [ATF]: 'If an applicant is ineligible to possess a firearm under § 922(g), then he cannot obtain a [concealed weapon] permit.'"  *Id.* (quoting *Wyoming*, 2007 WL 9735116, at *3).

### C.    ATF Reasonably Determined That Alabama State Law Does Not Actually Provide for Parity Between Types of Background Checks.

As explained, based on extensive and widespread evidence that Alabama is not providing for background checks commensurate with those performed by FFLs at the point-of-sale, ATF reasonably concluded that Alabama CCPs are not issued pursuant to a State law that "provides that such a permit is to be issued only after" a NICS background check and IAQ verification.  18 U.S.C. § 922(t)(3); *see* Defs.'

MSJ at 23-25.  In response, Plaintiffs do not attempt to cast serious doubt on ATF's empirical conclusion; instead, as in *Roberts*, "Plaintiffs contend that § 922(t)(3) looks *only* to the face of [the relevant state statute] and not to the way the state statute is being administered." *Roberts*, 2020 WL 7396316, at *8 (citation and internal punctuation omitted); *see* Pls.' Opp. at 21-24. But while ATF's interpretation of Section 922(t)(3) "is consistent with the text, design, and purpose of the Brady Act, and is therefore persuasive," Plaintiffs' proposed interpretation "is neither textually nor substantively sound." *Roberts*, 2020 WL 7396316, at *8-9. "Accordingly, the [2019] PSA was not issued 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. at *10 (quoting 5 U.S.C. § 702(2)(C)).

Additionally, Plaintiffs fail to advance their claims by relying on a memorandum in the administrative record from ATF's Chief Counsel to the Department of Justice's Office of Policy Development ("OPD Memo"). Pls.' Opp. at 25-26.  The OPD Memo responded to a proposal "that ATF condition the acceptance of permits as Brady alternatives on the existence of an appropriate permit revocation mechanism under State law" by explaining that the proposed condition lacked statutory authority.  ATF000764.  But ATF specifically distinguished this proposed condition from the agency's interpretation of Section 922(t)(3) to require "parity between the background check required of permittees and the NICS check

undergone by other purchasers of firearms." ATF000765. As explained, ATF's interpretation that "the 'information available' to State permit officials would include a NICS check" is anchored in the statute's allowance of permits as an alternative if "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." *Id.*; *see also* ATF000752 (explaining that "[a]s of November 30, 1998, 'the information available to' State officials will include NICS"). Thus, far from casting doubt on the correctness of ATF's interpretation of Section 922(t)(3), the OPD Memo reinforces it by distinguishing that interpretation from a proposal not grounded in the statutory text.

## D.     Plaintiffs Misplace Their Objections to the Alabama AG Letter.

As previously explained, on July 22, 2019, ATF sent a letter to the Alabama Attorney General ("2019 AG Letter"), *see* ATF000676-78, explaining that "the continuing failure of some Alabama sheriffs to complete full NICS checks prior to issuance of CCP permits creates an unacceptable risk to public safety." *See* Defs.' MSJ at 8-9. The letter instructed Alabama that it should undertake four corrective measures to ensure that Alabama CCPs could once again be accepted as NICS alternatives: (1) "ensure that CCP requirements are only issued . . . as required by Ala. Code § 13A-11-75"; (2) complete NICS checks on persons "issued CCP permits

18

without a NICS check"; (3) revoke permits "issued to individuals found to be prohibited" through those NICS checks; and (4) "take reasonable efforts to retrieve all firearms" from prohibited persons.  ATF000678.

Defendants explained in their prior brief that Plaintiffs misplace their objections to the 2019 AG Letter as exceeding ATF's statutory authority.  Defs.' MSJ at 26-29.  As a threshold matter, the 2019 AG Letter "is a separate document that is not referenced nor included in the [2019] PSA."  *Roberts*, 2020 WL 7396316, at *13.  Plaintiffs never referenced the 2019 AG Letter in their complaint, *see* ECF No. 1, and "[r]elief cannot be granted based on the letter when Plaintiffs have not even pled that it constitutes a 'final agency action' reviewable under 5 U.S.C. § 706."  *Roberts*, 2020 WL 7396316, at *13.

In any event, "notwithstanding the absence of a challenge to the letter, Plaintiffs' allegations are wrong on the merits."  *Id*.  "[T]he first corrective measure is just a restatement of the statutory requirements under § 922(t)(3)," and the "other three requirements pertain to 'curing' [permits] that were previously issued outside the scope of § 922(t)(3)."  *Id*.[8]  It is "well within [ATF's] discretion to ensure that

---

[8] The first three items in the letter at issue in *Roberts* are substantively indistinguishable from the first three items in the 2019 AG Letter.  *Compare Roberts*, 2020 WL 7396316, at *13, *with* ATF000678.  The fourth item in the *Roberts* letter stated: "Should you determine that an individual is in possession of a firearm in violation of Federal, but not State law, those cases should immediately be referred to the local ATF field office."  *See* 2020 WL 7396316, at *13.  Though here, the 2019 AG Letter instead specified that the State "take reasonable efforts to retrieve all firearms" from prohibited persons, this item is also "well within ATF's discretion to ensure that

such [permits] are not possessed by prohibited persons before qualifying them as valid Brady alternates." *Id*. Indeed, the agency "has long stated that 'if a State d[oes] not disqualify all individuals prohibited under Federal law, the permits issued by that State w[ill] not be accepted as alternatives under the permanent provisions of the Brady law.'" *Id*. (quoting ATF000752). Thus, these corrective measures are consistent with the statute and with principles of federalism.[9]

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, the Court should dismiss this case or enter summary judgment for Defendants.

Dated:  February 8, 2021                     Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Acting Assistant Attorney General

                                             LESLEY FARBY
                                             Assistant Branch Director

                                              /s/  *Daniel Riess*
                                             DANIEL RIESS (Texas Bar No. 24037359)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, D.C.  20005
                                             Tel: (202) 353-3098

---

such [permits] are not possessed by prohibited persons before qualifying them as valid Brady alternates." *Id*.

[9] For the same reasons, the 2019 PSA is interpretive rather than legislative in nature, and therefore notice-and-comment rulemaking was not required.  *See* Defs.' MSJ at 28.

Fax: (202) 616-8460
Daniel.Riess@usdoj.gov

Sarah C. Blutter
Assistant United States Attorney
1801 4th Avenue North
Birmingham, Alabama 35203
(205) 244-2119
Sarah.Blutter@usdoj.gov
*Attorneys for Defendants*

21